**AMERICAN TRUCKING ASS'NS, Inc. et al. v. UNITED STATES et al.**

Civ. No. 6758.

United States District Court,
N. D. Alabama, S. D.

Dec. 14, 1951.

Marc Ray Clements, Tuscaloosa, Ala., Edgar S. Idol, Harry E. Boot, and Francis W. McInerny, all of Washington, D. C., James W. Wrape and Wrape & Hernly, all of Memphis, Tenn., George S. Dixon, Detroit, Mich., Herbert Baker, Columbus, Ohio, Joseph H. Blackshear, Gainesville, Ga., Noel F. George, Columbus, Ohio, William R. Hefferan, Detroit, Mich., for plaintiffs.

For Intervenors in support of Plaintiffs:

M. W. Wells and Maguire, Voorhis & Wells, all of Orlando, Fla., for Florida Citrus Commission, and Growers and Shippers League of Florida.

Charles W. Bucy, Associate Solicitor, Henry A. Cockrum, Atty., Washington, D. C., for Secretary of Agriculture.

Lewis Petteway, General Counsel, Florida Railroad & Public Utilities Commission, Tallahassee, Fla., for Florida Railroad & Public Utilities Commission.

Walter, Burchmore & Belnap, Chicago, Ill., for The National Industrial Traffic League.

Harold J. Waples, Wilber M. Brucker, Arthur P. Boynton and Robert A. Sullivan, and Clark, Klein, Brucker & Waples, all of Detroit, Mich., for L. R. Burnham, et al. d/b/a Burnham's Van Service.

J. Douglas Harris, Alabama Public Service Commission, Montgomery, Ala., Guyte P. McCord, Jr., Florida Railroad & Public Utilities Commission, Tallahassee, Fla., Bland Godwin, Jr., Georgia Public Service Commission, Atlanta, Ga., for Southeastern Association of Railroad and Utilities Commissioners, Amicus Curiae.

J. Howard McGrath, Atty. Gen., John F. Baecher, Special Assistant to the Attorney General, John H. D. Wigger, Special Assistant to the Attorney General, Department of Justice, Washington, D. C., John D. Hill, U. S. Atty., Birmingham, Ala., for the United States.

Daniel W. Knowlton, Chief Counsel, E. M. Reidy, Associate Chief Counsel and S. R. Howell, Assistant Chief Counsel, Interstate Commerce Commission, all of Washington, D. C., for Interstate Commerce Commission.

For Intervenors in support of Defendants:

Joseph F. Johnston, Birmingham, Ala., Charles Clark, Washington, D. C., Frank W. Gwathmey, Washington, D. C., Joseph H. Hays, James W. Nisbet, Chicago, Ill., R. T. Wilson, Jr., Richmond, Va., and Carl Helmetag, Jr., Philadelphia, Pa., for Railroads.

Burton K. Wheeler, Edward K. Wheeler, Robert G. Seaks, J. Albert Woll, and Wheeler & Wheeler, all of Washington, D. C., for International Brotherhood of Teamsters-Chauffeurs-Warehousemen & Helpers of America.

Clarence D. Todd, Jr., Dale C. Dillor, Ralph E. Curtiss; Todd, Dillon & Curtiss, all of Washington, D. C., for Contract Carrier Conference of the American Trucking Associations.

Smith Troy, Atty. Gen., and Don Cary Smith, Asst. Atty. Gen. of the State of Washington, for the State of Washington, Amicus Curiae.

Before McCORD, Circuit Judge, and KENNAMER and LYNNE, District Judges.

LYNNE, District Judge.

Invoking the jurisdiction of this duly constituted district court of three judges pursuant to the provisions of 28 U.S.C.A. §§ 1336, 1398, 2284, and 2321 to 2325, plaintiffs,[1] consisting of three associations of truckers together with fourteen motor common carrier corporations, instituted this action to enjoin, set aside or annul an order of defendant,[2] Interstate Commerce Commission (hereinafter referred to as the Commission), entered May 8, 1951.[3]

By the order complained of the Commission undertook to prescribe rules governing the practices of authorized carriers of property by motor vehicle in interstate or foreign commerce in the augmentation and interchange of equipment and the rental of vehicles or equipment to private carriers or shippers.[4]

1. Intervening as of right and ranged in support of plaintiffs were: Florida Citrus Commission and Growers & Shippers League of Florida; Secretary of Agriculture of the United States; Florida Railroad & Public Utilities Commission; Secretary of the National League of Wholesale Fresh Fruit and Vegetable Distributors; The National Industrial Traffic League; and, L. R. Burnham, B. Emerita Reese, B. Le Roy Burnham, and Otis B. Burnham, co-partners d/b/a Burnham's Van Service.

An Amicus Curiæ brief in support of plaintiffs' position by leave of court was filed by Southeastern Association of Railroad and Utilities Commissioners.

2. In view of the attitude of the Secretary of Agriculture, the Attorney General elected not to enter an appearance for the United States, a defendant and necessary party.

Intervenors who submitted briefs supporting the Commission were: Class I Railroads; International Brotherhood of Teamsters-Chauffeurs-Warehousemen and Helpers of America; Contract Carriers Conference of American Trucking Associations.

An Amicus Curiæ brief in support of the Commission by leave of court was filed by the State of Washington.

3. "Lease and Interchange of Vehicles by Motor Carriers, Ex parte No. MC-43."

4. The rules adopted by the entire Commission appear in Appendix E, Exhibit O to the original complaint beginning at page 184. They are liberally summarized as follows:

Section 207.2 contains definitions of terms.

Section 207.3 exempts from the rules the following equipment, except as to requirements relative to inspections and identification of equipment; (a) equipment leased by one authorized carrier, operating over routes or within territories, to another such carrier and operated between points and over routes which both lessor and lessee are authorized to serve; (b) equipment used in transportation of railway express traffic, or in substituted motor-for-rail transportation of railroad freight moving between railroad stations on railroad billing; (c) equipment utilized in transportation performed solely and exclusively within any municipality, contiguous municipalities, or commercial zones; (d) equipment utilized by an authorized carrier in transportation performed pursuant to any plan of operation approved by the Commission under Section 5 of the Interstate Commerce Act; (e) equipment without drivers leased by an authorized carrier from an individual, partnership or corporation whose principal business is leasing equipment without drivers for compensation.

Section 207.4 prescribes rules for augmenting equipment, other than equipment used in interchange service, and provides (a) that authorized carriers may perform transportation in or with equipment which they do not own, provided: (1) it be under a contract or lease, made between the authorized carrier and owner of the equipment; (2) shall be in writing and signed by the parties; and (3) specify the period for which it applies, not less than 30 days, provided, further, that for 6 months from the date the rules became effective, equipment utilized in carrying livestock, fish, or agricultural commodities may be utilized by authorized carriers under contracts, leases, or other arrangements. applying for less than 30 days; provided the equipment is being returned over reasonably direct routes from the destination of the shipments; (4) that the contract or lease provides for the exclusive possession, control and use of the equipment and for the complete assumption of responsibility in respect thereto by the authorized carrier, and the equip-

On its own motion by order dated January 9, 1948, the Commission instituted an investigation into the lawfulness of the practices of the motor common and contract carriers subject to its jurisdiction respecting: the performance by such carriers of transportation with vehicles owned by others; the interchange of vehicles between such carriers; and the lease of vehicles by such carriers either with or without drivers to private motor carriers and shippers. All motor common and contract carriers subject to the Commission's jurisdiction were made respondents. Upon each of them was served a copy of such order containing an appendix in which was

ment may not be further leased for such duration.

Section 207.4. (a) (5) The lease shall specify the compensation to be paid by the lessee which shall not be computed on the basis of any division or percentage of any rate on the commodities transported or on the percentage of revenue earned by the vehicle; (6) it shall specify the time and date on which the agreement begins and terminates; (7) the lease shall be executed in triplicate, a copy to be carried on the equipment during the period of the lease unless a certificate be carried, certifying the fact of operation, name of owner, dates of lease and period thereof, restrictions on commodities; (b) when possession of equipment is taken by the authorized carrier he shall give a receipt to the owner thereof specifically identifying it and stating the precise time of taking possession and a similar receipt is to be given by the owner to the lessee when the vehicle is returned; (c) before taking possession the lessee, or qualified inspector acting for him, must inspect the vehicle and furnish the report required by this rule, in order to insure that the safety requirements of the Commission's Motor Carrier Safety Regulations be complied with.

Section 207.4. (d) The carrier acquiring the use of the equipment shall properly and correctly identify such equipment as being operated for and by it in accordance with the Commission's requirements for identification of motor carrier vehicles, and removable devices may be used but (1) any such identification must be removed by lessee before returning vehicle to lessor; (2) unless a copy of the lease is carried on the vehicle a certificate must be carried certifying that it is leased, showing date of lease and period thereof, any restrictions of carriage, the location where the original lease is kept; (e) before any person other than a regular employee of authorized carrier is assigned to drive the equipment, the carrier must make certain the driver is familiar with the Commission's safety regulations; that a certificate of physical examination of the driver has been furnished; that the carrier leasing the equipment shall prepare and keep a manifest covering each trip for which the equipment is used in its service; (f) manifests and billing must be carried on the vehicle and copies thereof preserved.

Section 207.5 permits the interchange of equipment, by contract, lease, or other arrangement, between common carriers of property in connection with any through movement of traffic under the conditions: (a) that the agreement shall specifically describe the equipment, the points of interchange, the use to be made of the equipment and the consideration; (b) that the operating authority held by the parties to the interchange arrangements must authorize the transportation involved; (c) that each carrier must assign its own driver to operate the equipment interchanged; (d) that the traffic transported must move on through bills of lading, and the rates and revenues collected must be accounted for in the same manner if there had been no interchange and that charges for use of the equipment must be kept separate from the division of the rates; (e) that the carrier acquiring the use of the equipment to inspect same and see that it meets the standards of safety required by these rules; (f) that a copy of the agreement of interchange shall be carried on the vehicle so operated in interchange service.

Section 207.6(a). Rental of equipment by authorized carriers to noncarriers is prohibited unless such service is authorized by the carriers' operating authority; (b) also authorized common carriers shall not rent equipment, without drivers, to noncarriers.

It is to be noted that trip leasing is not prohibited entirely by the Commission's rules. It is permissible under the rules for authorized carriers to (1) trip lease each other's equipment; and (2) trip lease equipment from owner-operators, private carriers and exempt carriers, provided the authorized carriers furnish their own drivers to drive the equipment leased.

set forth rules and regulations in tentative form and substance, compiled by the Commission's Bureau of Motor Carriers. In addition, copies thereof were published in the Federal Register and in the office of the Secretary of the Commission.

Hearings before Examiner Henry C. Lawton, to whom the matter was assigned, occupied nineteen days between October 14, 1948, and January 27, 1949. Eighty witnesses testified. Interested participants, represented by able counsel, exhibited throughout an understandable zeal and partisanship responsible for the compilation of a record consisting of 3,640 pages of testimony and 120 exhibits.

Proceeding to an analysis of the evidence and the positions of the parties, the Examiner found that the leasing and interchange practices of motor carriers have resulted in widespread and flagrant violations of the Act and the Commission's regulations [5] and concluded that the Commission had the statutory power to and should promulgate a new set of rules and regulations to cope with the situation. On August 26, 1949, he filed a Recommended Report diagnosing the ills and suggesting the remedies.[6]

Salient and most controversial features of the Examiner's proposals centered around his Rule II, providing that carriers augmenting their fleets with leased vehicles would be required to have written leases of at least thirty days' duration; that vehicles be driven by employes of the carrier; and that the compensation paid for the use of such vehicles be computed upon some basis other than a percentage of the revenues received for transporting commodities in the leased equipment. Rules preventing the carriers from leasing vehicles with drivers to shippers and requiring carriers to use their own employes to operate interchanged equipment were also included.

In the numerous exceptions to the Examiner's Proposed Report filed in behalf of the motor carrier parties the predominant note is negation of the Commission's authority to prescribe such rules. Expressions of dissatisfaction, disassociated from the question of statutory power, indicate an inability on the part of the affected carriers to agree among themselves as to the means which should be adopted to end the law evading practices existing in their industry. Some were apparently

---

5. The Examiner's Proposed Report, a part of the record in this case—see Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456—sets forth the need for regulation on Sheets 54 to 57, inclusive, as follows:

"The evidence herein, just received, is replete with examples of violations of the Interstate Commerce Act and the Commission's regulations thereunder in the present practices of the motor carriers in leasing equipment." (Sheet 54)

"Violations of the Act, aside from violations of the Commission regulations, occur under the guise of leasing, and are committed both by owner-operators and authorized carriers. There are frequent instances of record, where one of the former transported a shipment beyond the territory of the carrier under whose authority he had been hauling, and later attempted to have the unlawful transportation validated by a trip-lease." (Sheet 54)

"Authorized carriers violate the Act by permitting other authorized carriers to run over their routes or operate in their authorized territories under the

guise of leasing, when, as a matter of fact, no lease is entered into, and the ostensible lessee-carrier is merely accepting a small percent of the revenue for the privilege of allowing the purported lessor-carrier to operate over the lessee-carrier's route, or in the latter's territory, *without the approval of the Commission.*" (Sheet 55—Emphasis supplied)

"Perhaps in no other proceeding in which practices of motor carriers have been under investigation, has there been such a general admission by all parties, including those opposed to regulation, that violations of law and the Commission's regulations exist." (Sheet 56)

"The record warrants the conclusion that the leasing practices of the motor carriers permit violations of the Act, and the Commission's regulations thereunder, and that it is necessary that such practices be subjected to regulation." (Sheet 57)

6. The Examiner's proposed rules and regulations are Appendix B of the Report of the Commission, 52 MCC 675 (1951).

out of sympathy with the Examiner's views that the Commission should implement its regulatory efforts by clear and concise rules relating leasing and interchange practices to their proper function in the transportation field; others felt less stringent regulations could be evolved which could deal effectively with the situation without disturbing existing leasing arrangements.

On June 26, 1950, Division 5 of the Commission filed a Report and Order establishing rules and regulations governing the leasing and interchanging of motor vehicles by the authorized motor carriers.[7] Somewhat less restrictive than those proposed by the Examiner, they omitted the two polemical features of the latter, namely that the leases of owner-operator vehicles be of at least thirty days' duration and that the rental paid for leased vehicles be other than a percentage of the revenues received for transporting the commodities in leased equipment. In their report the members of Division 5 made it clear that they entertained no doubts as to the statutory authority of the Commission to regulate the leasing and interchange practices of motor carriers.[8]

Thereafter, upon consideration of the several Petitions for Reconsideration, oral arguments were heard by the entire Commission on October 30–31, 1950, in which counsel for the interested parties fully explored the authority of the Commission and the factual basis for the proposed rules.

On May 8, 1951, the Commission issued a Report and Order substantially modifying the action of Division 5. The rules and regulations prescribed by the entire Commission [9] virtually accepted the Examiner's proposals. While not requiring the motor carriers to use their own employes on leased equipment, Rule 207.4(a)(3) provides that leases of vehicles to be driven by the owners thereof shall be of at least thirty days' duration. Rule 207.4(a)(5) provides that the compensation for leased vehicles shall not be computed on the basis of any division or percentage of the rates received for transporting commodities in leased equipment. Rule 207.5(c) provides that where equipment is interchanged among carriers, each carrier must assign its own employe to operate the equipment while it is being run over the particular carrier's route. The remaining provisions of the rules merely implement the foregoing which are the heart of the regulatory scheme devised by the Commission.

Before resorting to this court plaintiffs exhausted their administrative remedies by petitions for reconsideration of the Commission's order, which by its terms was to have become effective August 1, 1951. Intervening orders have postponed the compliance date to February 1, 1952.

The antecedent history of conditions existing in that area of the total transportation system of this nation occupied by motor carriers illumines the proceedings before the Commission, to which we have adverted. The prevalence of practices thought to be inimical alike to the public safety and economy was brought to the attention of the Congress by the Federal Coordinator of Transportation in a report submitted in March, 1934,[10] to which was attached a proposed bill bearing the indorsement of the Commission as "imperatively necessary under present conditions." Fundamentally, the conditions to which the Coordinator referred under the descriptive term, "brokerage proposition" are identical with those described by the Commission as "the leasing problem" in its report of May 8, 1951.[11]

In 1935 the Congress enacted the Motor Carrier Act and made it Part II of the

---

7. These rules and regulations are found in Appendix A of the Commission's Report, 52 MCC 675.

8. Report of Division 5, 51 MCC 461, 514–526.

9. Appendix E to the Report: Lease and Interchange of Vehicles by Motor Carriers, 52 MCC 675 (1951), at pages 743–748.

10. "Regulation of Transportation Agencies." S.Doc. 152, 73rd Cong., 2d Sess., page 14, et seq.

11. Lease and Interchange of Vehicles by Motor Carriers, 52 MCC 675 (1951), at pages 677–682.

Interstate Commerce Act.[12] This Act provides a design of regulation for the motor carrier industry analagous to that applicable to the railroad industry since the passage of the Act to Regulate Commerce in 1887.[13] In brief, it drew within the orbit of federal control a family of regulated carriers of two principal types, motor common carriers offering service to the public generally, and motor contract carriers furnishing service to a limited group of shippers on a contractual basis as contrasted with schedules of rates equally available to all shippers.

Within the regulated group of carriers competition is limited by the requirements of Sections 207 and 209 that motor common carriers obtain certificates of convenience and necessity, and that motor contract carriers obtain permits upon proof that their proposed operations will be consistent with the public interest. For both groups of regulated carriers the certificate and permit requirements provide protection from an oversupply of transportation facilities that would weaken and undermine sound economic conditions in the field of transportation. But in return for working in a field of protected competition, these carriers have assumed certain responsibilities. These responsibilities include, in the case of common carriers, the obligation to render service to the public, the obligation to maintain reasonable rates, and the obligation to confine operations to a prescribed territory or set of routes. The responsibilities of the motor contract carriers are somewhat less stringent, for their pricing systems are less restricted and their obligations to provide nondiscriminatory service less onerous, but by accepting the status they give up the right to hold out their services to the public generally. In addition, the regulated carriers are subject to the powers of the Commission to establish and enforce safety rules and regulations.

For reasons deemed sufficient by the Congress and which are not open to question here, the Motor Carrier Act excluded from economic regulation a considerable number of motor trucking operations, some of a wholly public, others of an essentially private nature. Section 203 of the Act contains an extensive list of trucking operations that fall outside of the field of economic regulation and only come under the Commission's jurisdiction in regard to safety of operation. Included in these exceptions, for example, are vehicles used in hauling agricultural commodities, livestock, and fish; vehicles used within city limits or the commercial zones of metropolitan cities; and motor vehicles used in purely private carriage.

It is a matter of common knowledge that whether the trucking operation is within or without the orbit of economic regulation, the vehicles used are not substantially different. The trucker hauling oranges from Florida to New York City—an operation exempt from economic regulation—or the manufacturing company hauling its own products from the place of manufacture to the consumers—which is excepted private carriage—use motor vehicles substantially equivalent to those used by companies operating within the sphere of regulated transportation. Since there is no limit on the number of truckers who may engage in exempt operations and no economic regulation of private carriage, the number of vehicles used in operations outside of regulation far exceeds those used in regulated transportation.

The record demonstrates that the leasing practices of authorized carriers have presented difficult and complex problems from the very inception of regulation. Convenient access to an abundant supply of equipment exempt while in the exclusive use of the owners has encouraged regulated carriers to make use of such equipment to perform their normal transportation func-

12. Act of August 9, 1935. 49 Stat. 543, as amended by the Act of September 18, 1940, 54 Stat. 919, 49 U.S.C.A. § 301 et seq.

13. Act of February 4, 1887, 24 Stat. 379, which by the passage of the Transportation Act of 1920, Act of February 28, 1920, 41 Stat. 456, became the Interstate Commerce Act, 49 U.S.C.A. §§ 27, 1 et seq.

tions, under arrangements which vary as widely as the possibilities of men to agree upon means and methods of acting together.

Complaints emanating from within the industry itself, recurring frequently throughout the proceedings of record, indicate the prevalence of a practice on the part of certificated carriers to obtain traffic, shop around for a truck owner who would handle all of the transportation in his own vehicle, and retain a portion of the revenues received from the shipper as a reward for procuring the business. The owner of the rented truck, holding neither certificate nor permit and being exempt from regulation, would thus perform the essential transportation services of the regulated carrier. In many instances such leases have been but for a single trip so that when the trucker reached his destination and accomplished delivery. he reverted to his original status and either returned empty or hired himself and his truck to another carrier for a return load. Because of the attractiveness of the transportation industry and the difficulty of obtaining certificates and permits, increasingly large numbers of independent truckers became available to the regulated carriers on a per-trip basis. Impetus was imparted to this trend when servicemen returning from the recent war were enabled by governmental aid easily to procure motor vehicle equipment.

Thus there has evolved a large group of "owner-operators," sometimes referred to as "gypsies,"[14] who move into and out of the orbit of regulated transportation by some type of lease arrangement with authorized carriers. Often unknown individually to the Commission, they perform the essential operations of regulated carriers on a trip basis, regardless of their fitness and ability to meet the Commission's standards for certification, regardless of whether there is a public need for the operation, and regardless of the resultant distortion of operating ratio which obviously has an adverse competitive impact on the authorized carriers.

Certain practices of carriers in interchanging equipment among themselves claimed the attention of the Commission. It appears from the record that a prevalent usage in the industry is for a carrier having authority to handle traffic between two cities to contract for a shipment to points beyond its authorized territory. In lieu of giving the traffic to another carrier to move to destination, the first carrier will secure the right to operate over the second carrier's route upon the payment of a flat charge. This practice is tantamount to a leasing by the second carrier of its operating rights to the first carrier without the Commission's approval as required by Section 212(b) of the Act.

To a lesser extent authorized carriers have sometimes avoided the limitations of their certificates by leasing their equipment with drivers to shippers, thus permitting the carriers to haul the shipper's traffic to points beyond their authorized territories.

The result of the employment of these three devices has been to enfeeble the Commission in its effort to control the motor carrier industry. As a consequence, the entire scheme of economic and safety regulation of the transportation services of the nation has been imperiled.

Cognizance of the foregoing trends and tendencies was taken by the Commission's Bureau of Motor Carriers in the early days of regulation. On August 19, 1936, the Bureau issued its Administrative Ruling No. 4.[15] The relaxation of this rule, which,

---

14. "Gypsies" is not used here as a term of opprobrium, for the record pictures them as more sinned against than sinning. In the Commission's report (p. 678) they are defined as "roving owner-operators" or itinerant truckers, who select heavy loading, high revenue freight to handle, and who "are not interested in less-than-truckload traffic because of the time consumed in handling it, and the cost of loading and unloading it."

15. "The lease or other arrangement by which the equipment of an authorized .operator is augmented must be of such a character that the possession and control of the vehicle is, for the period of the lease, entirely vested in the authorized operator in such a way as to be good against the world, including the lessor; that the operation thereof must be conducted under the supervision and control of such carrier; that the vehicles.

though never officially adopted by the Commission, might have been an effective curb upon evasive practices, was apparently due to the results of cases, dealing with the "grandfather clause" wherein parties were litigating with respect to "grandfather rights."[16] Be that as it may, the rule obtaining before the promulgation of the regulations in question was that when an authorized carrier furnishes service in vehicles owned and operated by others, he must control the services to the same extent as if he owned the vehicles, but need control the vehicles only to the extent necessary to be responsible to the shipper, the public and the Commission for the transportation.[17]

As early as 1940 the Bureau of Motor Carriers, recognizing the inefficacy of existing rules and regulations to eliminate or mitigate violations accomplished by means of false, fraudulent or fictitious leases devised for the purpose of circumventing the Act, began a study of the leasing practices of authorized carriers.[18] Interrupted by the exigencies of the late war, it continued and became the basis for the proceedings now under review.

That the seriousness of the problem relating to the leasing and interchange of equipment is not a figment of bureaucratic imagination is attested by the fact that plaintiff, American Trucking Associations, Inc., the national organization of the trucking industry, submitted rules which it considered appropriate as corrective measures and which are included in Appendix C, Exhibit C to the complaint. Moreover, the record makes it clear that a substantial segment of the motor carrier industry recognizes the imperative need for a regulation of such practices.

The judicial process is not designed to function in a vacuum and the laborious review we have accorded to the voluminous record and its exhibits has served to clarify, not to becloud, the issues upon which the main battle-line is to be drawn. The springboard from which we launch our inquiry is the basic contention of plaintiffs that the rules and regulations of which complaint is made were beyond the statutory jurisdiction of the Commission. It is at once apparent that a conclusion of lack of authority would put an end to the controversy.

It is not pretended that the Commission is possessed of any power apart from that which is conferred upon it expressly or by necessary implication by the statute of which it is the creature. Our function is to interpret the statute and construe its language so as to give effect to the intent of Congress without a preconceived notion that the particular power asserted should have been either granted or withheld. Mr. Justice Reed, writing for the Court in United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345, a case involving the Motor Carrier Act, 1935, precisely stated the function of the courts in statutory construction.[19]

---

must be operated by persons who are employees of the authorized operator, that is to say, who stand in the relation of servant to him as master."

16. See, e. g., Acme Fast Freight, Inc., v. United States, 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993, affirming, per curiam, D.C.S.D.N.Y., 1940, 30 F.Supp. 968; United States v. Rosenblum Truck Lines, 1942, 315 U.S. 50, 62 S.Ct. 445, 86 L.Ed. 671; Thomson v. United States, 1944, 321 U.S. 19, 64 S.Ct. 392, 88 L.Ed. 513.

17. 52 MCC 675 (1951), at page 679. cf: Dixie Ohio Exp. Co. Common Carrier Application 17 MCC 735.

18. A discussion of the efforts of the Bureau to regulate the leasing of vehicles by authorized carriers and an analysis or relevant statistical data compiled on the eve of the proceedings before the Commission is contained in the latter's report: 52 MCC 675 (1951), beginning at page 682.

19. "In the interpretation of statutes, the function of the courts is easily stated. It is to construe the language so as to give effect to the intent of Congress. There is no invariable rule for the discovery of that intention. To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute, particularly in a law drawn to meet many needs of a major occupation.

"There is, of course, no more persua-

Starting with the premise that the Interstate Commerce Act of 1940, enunciating a National Transportation Policy,[20] was intended to expand the statutory jurisdiction of the Commission, we enter upon a consideration of those clauses and sections of Part II of the Act wherein the power to establish the rules and regulations in controversy is supposed to have been conferred. Sanction for this method of analytical approach is found in the following paragraph from the opinion of the Court in United States v. Pennsylvania Railroad Co., 323 U.S. 612, at page 616, 65 S.Ct. 471, at page 474, 89 L.Ed. 499: "The 1940 Transportation Act is divided into three parts, the first relating to railroads, the second to motor vehicles, and the third to water carriers. That Act, as had each previous amendment of the original 1887 Act, expanded the scope of regulation in this field, and correlatively broadened the Commission's powers. The interrelationship of the three parts of the Act was made manifest by its declaration of a 'national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each.' The declared objective was that of 'developing, coordinating, and preserving a national transportation system by water, highway, and rail, * * *

sive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' The interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function. This duty requires one body of public servants, the judges, to construe the meaning of what another body, the legislators, has said. Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat but hardly justifies an acceptance of a literal interpretation dogma which withholds from the courts available information for reaching a correct conclusion. Emphasis should be laid, too, upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts. A few words of general connotation appearing in the text of statutes should not be given a wide meaning, contrary to a settled policy, 'excepting as a different purpose is plainly shown.' "

20. Act Sept. 18, 1940, C. 722, Title I, Sec. 1, 54 Stat. 899, amended the Interstate Commerce Act by inserting before Part I thereof, 49 U.S.C.A. note preceding section 1, the following provision entitled "National Transportation Policy": "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."

adequate to meet the needs of the commerce of the United States * * *' Congress further admonished that 'all of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.' 54 Stat. 899".

Integrating the functions of transporting persons and property by rail, by road and by water into a mosaic of great complexity and infinite variety, the Congress in broad and sweeping terms committed its regulation to the Commission, which had for half a century exhibited both fidelity and skill in this rapidly expanding field of industrial adventure. Without changes relevant here the provisions of the Motor Carrier Act fell into place as Part II of the new Act.

Against the backdrop of the clearly expressed intent of the Congress the following provisions of the 1940 Transportation Act emerge full-bodied and pregnant with meaning:

Section 202(a): "The provisions of this chapter apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce and to the procurement of and the provision of facilities for such transportation, and the regulation of such transportation, and of the procurement thereof, and the provision of facilities therefor, is vested in the Interstate Commerce Commission."

Section 203(a) (19): "The 'services' and 'transportation' to which this chapter applies include all vehicles operated by, for, or in the interest of any motor carrier irrespective of ownership or of contract, express or implied, together with all facilities and property operated or controlled by any such carrier or carriers, and used in the transportation of passengers or property in interstate or foreign commerce or in the performance of any service in connection therewith."

Section 204(a) (1) and (2): "It shall be the duty of the Commission—"(1) To regulate common carriers by motor vehicle as provided in this chapter, and to that end the Commission may establish reasonable requirements with respect to continuous and adequate service, transportation of baggage and express, uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment.

"(2) To regulate contract carriers by motor vehicle as provided in this chapter, and to that end the Commission may establish reasonable requirements with respect to uniform systems of accounts, records, and reports, preservation of records, qualifications and maximum hours of service of employees, and safety of operation and equipment."

It is readily apparent that the Commission's power to prescribe rules and regulations for controlling the leasing practices of motor carriers is not spelled out in the foregoing provisions of the Act. Nor may such authority be found in the precise enumeration of duties especially enjoined upon the Commission by the entire Section 204 of the Act. From this it is argued that the asserted jurisdiction is nonexistent. This device of strict construction, proceeding from a misapplication of the maxim, *expressio unius est exclusio alterius,* would sterilize a statute of less magnificent proportions, and its fallacy was clearly demonstrated in United States v. Pennsylvania Railroad Co., supra, as follows: "There is no language in the present Act, which specifically commands that railroads must interchange their cars with connecting water lines. We cannot agree with the contention that the absence of specific language indicates a purpose of Congress not to require such an interchange. True, Congress has specified with precise language some obligations which railroads must assume. But all legislation dealing with this problem since the first Act in 1887, 24 Stat. 379, has contained broad language to indicate the scope of the law. The very complexities of the subject have necessarily caused Congress to cast its regulatory provisions in general terms. Congress has, in general, left the contents of these terms to be spelled out in particular cases by administrative and judicial action, and in the light of the congressional purpose to foster an efficient and fair national transportation system. Cf. Chicago, R. I. & P. R. Co. v. United

States, 274 U.S. 29, 36, 47 S.Ct. 486, 489, 71 L.Ed. 911; Interstate Commerce Commission v. Railway Labor Executives Ass'n, 315 U.S. 373, 376, 377, 62 S.Ct. 717, 719, 720, 86 L.Ed. 904."

Authority of the Commission to regulate interchange practices of motor carriers is necessarily implied from the provisions of Section 216(c) of the Act: "Common carriers of property by motor vehicle may establish reasonable through routes and joint rates, charges, and classifications with other such carriers or with common carriers by railroad and/or express and/or water; and common carriers of passengers by motor vehicle may establish reasonable through routes and joint rates, fares, or charges with common carriers by railroad and/or water. In case of such joint rates, fares, or charges it shall be the duty of the carriers parties thereto to establish just and reasonable regulations and practices in connection therewith, and just, reasonable, and equitable divisions thereof as between the carriers participating therein which shall not unduly prefer or prejudice any of such participating carriers."

It seems clear that the privilege of participating in through routes and joint rates begets the obligation to conduct a bona fide interchange arrangement and not to lease each other's rights without the Commission's approval.

But it is insisted that regardless of language found elsewhere in the Act any grant of power supporting the Commission's rules relating to leasing and interchange is expressly delimited by the following common provisions of Sections 208(a) and 209(b): "That no terms, conditions, or limitations shall restrict the right of the carrier to add to his or its equipment and facilities over the routes, * * * (within the scope of the permit or within the territory specified in the certificate) * * * as the development of the business and the demands of the public shall require."

This language, it is said, is clearly expressive of a Congressional intent to deny to the Commission authority in any way to restrict or control the manner in which motor carriers augment their equipment. Lifted from the context in which they ap-

pear, these words at best lend but plausible support to plaintiffs' argument. Their introduction into the section through the medium of a proviso presupposes a preceding grant of power which they were intended to limit. In other words, but for the language of the provisory clauses, Sections 208(a) and 209(b) clearly enable the Commission to regulate the manner in which such carriers add to their equipment.

Writing for a three-judge court in Crescent Express Lines, Inc., v. United States, D. C., 49 F.Supp. 92, at page 94, L. Hand, Circuit Judge, observed: "Thus it appears, not only because the certificate is to 'specify the service to be rendered' as well as the routes over which it shall be rendered, but also because that service is to be always subject to regulation in the interests of the public, that Sec. 308(a)—unless because of its proviso—leaves complete regulatory power in the Commission's hands. That proviso does, however, set a limit upon its power, and the result at bar depends upon what that is. It declares that none of the 'terms, conditions, or limitations shall restrict the right of the carrier to add to his or its equipment and facilities * * * as the development of the business and the demands of the public shall require.' The parties at bar appear to assume that this is more than merely a direction for the guidance of the Commission; and that, ex proprio vigore, it gives the carrier the privilege without recourse to the Commission of adding to his service as he may find it desirable to do so. That is indeed probably its true meaning; in any event we shall assume so for the purposes of this case, for in any event it must be read quantitatively."

In affirming the lower Court, the Supreme Court, in Crescent Express Lines, Inc. v. United States, 320 U.S. 401, at page 409, 64 S.Ct. 167, at page 171, 88 L.Ed. 127, agreed with the Commission:

"* * * that the proviso is a prohibition against a limitation on the addition of more vehicles of the authorized type, not a prohibition of the specification of the type. * * *

"We are of the view that the power of the Commission to limit the certificate as it pro-

poses to do is in accord with the purposes of the Motor Carrier Act."

Reading the proviso quantitatively, we turn to the rules [21] to determine whether the Commission has transgressed the limits of the prohibition. While they are forbidden to continue the practice of leasing both truck and driver on a per trip basis, carriers may still:

(a) Lease all of the equipment they want without drivers from truck rental concerns. (Rule 207.2(d).)

(b) Lease from either carriers or non-carriers, equipment on a short-term or trip basis without drivers.

(c) Lease equipment with drivers where the lease extends for more than thirty days.

(d) Purchase and own all the equipment the carrier desires and either have such equipment operated by the carriers' own employes or by independent contractors.

(e) Build and own all of the equipment the carrier desires and either have it operated by the carriers' own employes or by independent contractors.

■ It is our considered opinion that these rules are not the equivalent of a limitation on the addition of more vehicles. We pretermit any discussion of the statutory jurisdiction of the Commission to abrogate the practice of leasing and hold that it is empowered by the provisions of the Act, to which we have referred, to regulate by reasonable rules the manner in which motor carriers procure or provide by lease or interchange the equipment used by them in performing their essential transportation services.

Having disposed of the threshold contention relating to authority in the field in which it was exercised, we turn to the requirements of the Administrative Procedure Act of June 11, 1946,[22] to determine their impact upon the proceedings before the Commission and upon the ambit of judicial review of administrative actions. Because of the variant functions of governmental agencies, we deem it essential to inquire whether the Commission was engaged in "rule making," as defined by Section 2(c), or "adjudication," within the contemplation of Section 2(d) of this Act in the process of formulating the rules under review.

We are content to end our research and answer our query with the language of Justice Brandeis in delivering the opinion of the Court in Assigned Car Cases, 274 U.S. 564, at page 583, 47 S.Ct. 727, at page 733, 71 L.Ed. 1204, wherein he stated: "The claim is that the evidence, upon which the finding of the resulting discrimination in these other transportation facilities rests, relates to only a few carriers, and that the general finding to that effect is without support, because the evidence introduced was not shown to be typical. Compare New England Divisions Case (Akron, C. & Y. R. Co. v. U .S.), 261 U.S. 184, 196, 197, 43 S.Ct. 270, 67 L.Ed. 605; United States v. Abilene & Southern Ry. Co., 265 U.S. 274, 291, 44 S.Ct. 565, 68 L.Ed. 1016. The argument overlooks the difference in the character between a general rule prescribed under paragraph (12) and a practice for particular carriers ordered or prohibited under sections 1, 3, and 15 of the Interstate Commerce Act. In the cases cited, the Commission was determining the relative rights of the several carriers in a joint rate. It was making a partition; and it performed a function quasi-judicial in its nature. In the case at bar, the function exercised by the Commission is wholly legislative. Its authority to legislate is limited to establishing a reasonable rule. But in establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable. In this connection, the Commission, like other legislators, may reason from the particular to the general."

Embarking upon the process of "rule making" in the exercise of a quasi-legislative function, the Commission was obligated by the terms of Section 4(a, b) of this Act to:

21. These rules and regulations are found in Appendix E of the Commission's Report, 52 MCC 675 (1951) at Pages 743–748.

22. 60 Stat. 237, 5 U.S.C.A. § 1001 et seq.

1. Notify the public of proposed rule making by filing notice in the Federal Register which shall contain (a) The time and place of rule making *proceedings*, (b) Reference to the authority under which the rule making is proposed, (c) The substance of the proposed rules.

2. Give all parties an opportunity to present written views, arguments and data with or without the right of oral presentation;

3. Incorporate a concise general statement of the basis for the rules; and

4. Where the statute requires agency hearings before rules can be prescribed, follow the provisions of Sections 7 and 8 of the Procedure Act.

■ It is not seriously urged that the Commission failed to observe the first three of the above numbered requirements. But it is vigorously contended that it virtually ignored the fourth in omitting fact-findings to support its rules. The short answer to this insistence is that Part II of the Interstate Commerce Act does not require hearings in rule making proceedings.[23] The decision law of the courts in cases involving the rate making activity of the Commission[24] is inapposite because the Act clearly requires full administrative hearings in the rate making process. Nor do the statutory provisions conferring the power to make the rules under attack condition its exercise upon the existence of a factual situation which first must be determined.[25]

Even though we hold that the Commission was not compelled to make findings of fact before exercising its rule making power, we have not read the record in this case and the seventy-three pages of the Commission's printed report, in which it analyzed the fact situation before it, the need for regulation, and the correlation of its proposed rules to the economic and safety problems it had encountered within the sphere of its control, without arriving at the opinion that it went "the last mile" to satisfy rigid standards for fact findings. The courts have never exacted of it a legalistic formalism in such findings but have recognized that they may be "interwoven" with its discussion of the evidence, relating it to the contentions of the parties and its own ultimate conclusions.[26]

■ Having concluded that in promulgating the rules in question the Commission was acting in a quasi-legislative capacity, we are instructed by the provisions of Section 10 of the Administrative Procedure Act, Title 5 U.S.C.A. § 1009, that we may review its actions to determine whether the rules: (1) Are arbitrary, capricious or an abuse of discretion; or (2) Contrary to Constitutional rights, power, privilege or immunity; or (3) In excess of statutory jurisdiction, authority or limitations, or short of statutory right; or (4) Were formulated without observance of procedure required by law.

We have heretofore considered and disposed of the third and fourth of the above numbered objects encompassed within the range of judicial review when other aspects of this case claimed our attention. The constitutional argument proceeds, on the one hand, from the premise that Part II of the Interstate Commerce Act, as we have interpreted it to confer power on the Commission to prescribe the instant rules, con-

---

23. While Sections 216(e) and 218(b) expressly provide that hearings must be held where the Commission is determining the legality or propriety of a motor carrier rate or charge, there is no such requirement in Section 204(6), which gives the Commission power to issue rules and regulations.

24. e. g. Interstate Commerce Commission v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102; State of New York et al. v. United States et al., 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492; Tennessee Valley Authority et al. v. United States et al., D.C., 96 F.Supp. 409.

25. Compare: Alabama Great Southern Railroad Company et al. v. United States et al., 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225; United States v. Baltimore & Ohio Railroad Company, 293 U.S. 454, 55 S.Ct. 268, 79 L.Ed. 587; State of Florida et al. v. United States et al., 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291.

26. Meeker v. Lehigh Valley R. Co., 236 U.S. 412, 428, 35 S.Ct. 328, 59 L.Ed. 644; United States v. Baltimore & Ohio R. Co., 293 U.S. 454, 55 S.Ct. 268, 79 L.Ed. 587; Tennessee Valley Authority v. United States, D.C., 96 F.Supp. 409.

travenes Article I, Section 1 of the Constitution; on the other, from the contention that the rules themselves are violative of the "due process clause" of the Fifth Amendment.

■ No one disputes the proposition that the Congress may not delegate to any person or group of persons its legislative power to make laws. It is equally well settled that it may delegate to an administrative body authority to make regulations to fill up the details of laws of its own enactment where it has indicated its will in such statutes. United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563. The difficulty lies in stating precisely the dividing line between legislation and administration. We are intrigued by the overtones and undertones of opinions concerned with the constitutionality of uses made by the Congress of "the necessary resources of flexibility and practicality * * * to perform its function". Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 387, 83 L.Ed. 441. But we are not tempted to undertake the task of reconciling the authorities against the background of the great and varying legislative experiments which provoked the several controversies with which they dealt.

One clear thread runs through the decisions which we have considered. For the purposes of this opinion it is best stated by paraphrasing the language of Chief Justice Stone in Yakus v. United States, 321 U.S. 414, at page 426, 64 S.Ct. 660, at page 668, 88 L.Ed. 834: "Only if we could say that there is an absence of standards for the guidance of the Administrator's (Commission's) action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose of preventing inflation" (its declared purpose to integrate and control the vast and complex transportation systems of this nation and thereby "to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers".—National Transportation Policy).

■ We think that the standards prescribed in the statement of the National Transportation Policy are no less definite and understandable than those contained in statutory enactments upheld by the Court in Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263; New York Central Securities Corp. v. United States, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138; National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344; Federal Trade Commission v. R. F. Keppel & Bro., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814; Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092; Hampton Jr. & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624; and Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624. Compare Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S. Ct. 837, 79 L.Ed. 1570; and Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446. Therefore we hold that the delegation of power by Part II of the Interstate Commerce Act to adopt these rules did not offend Article I, Section 1 of the Constitution.

■ Apposite to and dispositive of the point taken in briefs by plaintiffs and intervenors that the rules themselves violate the guaranties of the Fifth Amendment is the pithy analysis of Justice Brandeis of a similar contention advanced in Assigned Car Cases, 274 U.S. 564, at page 575, 47 S.Ct. 727, at page 731, 71 L.Ed. 1204, quoting: "There is clearly no constitutional obstacle. The rule prescribed does not involve a taking of the property of the private car owner. Congress could exclude private cars from interstate railroads. Compare United States v. Delaware & Hudson Co., 213 U.S. 366, 405, 406, 411, 415, 29 S.Ct. 527, 53 L.Ed. 836. And it may prescribe conditions on which alone they may be used. See Proctor & Gamble Co. v. United States, 225 U.S. 282, 32 S.Ct. 761, 56 L.Ed. 1091; Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722. Limiting their use does not involve regulation of the coal mining industry. Likewise, Congress may prescribe how carrier-owned cars shall be used. The

regulation prescribed does not invade the private business affairs of the carrier. It merely limits the use of certain interstate transportation facilities."

 Remaining for our attention and adjudication is the issue posed by the question: Are the rules prescribed arbitrary, capricious or an abuse of discretion? Certain fixed principles give direction to the course of our review. A court should not set aside the Commission's orders for either of the foregoing reasons if such orders are supported by the evidence.[27] "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." [28] It is the task of the Commission and not of the courts to pass upon the weight and credibility of the evidence.[29] Moreover,

there is a presumption that the Commission has properly performed its official duties and this presumption supports its acts in the absence of clear evidence to the contrary.[30]

The spirit in which the Commission moved to institute the proceedings before it on its own motion was apparently typified by the following excerpt from the testimony of the witness, W. Y. Blanning, Director of the Bureau of Motor Carriers, Interstate Commerce Commission: "The proposed drafts of regulations are designed first to stop legal things which are undesirable and also to aid in giving proof of (sic) when they are illegal." [31] To catalogue the practices of carriers of which there is substantial evidence in the record and which the Commission concluded were inimical to safe, adequate, economical and efficient transportation operations [32] would be a

27. Interstate Commerce Commission v. Union Pacific Railroad Company, 222 U. S. 541, 32 S.Ct. 108, 56 L.Ed. 308; O'Keefe v. United States, 240 U.S. 294, 36 S.Ct. 313, 60 L.Ed. 651; Board of Trade of Kansas City v. United States, 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432; United States v. Carolina Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971; Alton Railroad Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586; United States v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821.

28. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 694, 78 L.Ed. 1260; Rochester Telephone Corp. v. United States, 307 U.S. 125, 59 S.Ct. 754, 83 L.Ed. 1147.

29. Merchants Warehouse Co. v. United States, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227; Loving v. United States, D. C., 32 F.Supp. 464, affirmed 310 U.S. 609, 60 S.Ct. 898, 84 L.Ed. 1387; United States v. Carolina Freight Carriers Corp., supra; Lang Transportation Co. v. United States, D.C., 75 F.Supp. 915; Hanna Furnace Corp. v. United States, D.C., 53 F.Supp. 341, affirmed per curiam 323 U.S. 667, 65 S.Ct. 41, 89 L.Ed. 543.

30. United States v. Chemical Foundation, 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131; Baltimore & Ohio R. Co. v. United States, 298 U.S. 349, 358, 56 S.Ct. 797, 80 L.Ed. 1209; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

31. At page 71 of the record in this case.

32. Typical of the problems created by the practice of trip leasing, of which there is evidentiary support and which the Commission found to exist, are:

(1) The owner-operators utilized on trip leases, after the completion of their trips are on their own and the carrier assumes no responsibility for returning them to their homes. This necessitates the owner-operator hawking his services to other carriers or engaging in illegal transportation directly with shippers. In either event there is no established pattern of operations by the owner-operator and he comes into and out of regulated transportation depending upon the desires of the authorized carriers. (Report of Commission, 52 M.C.C. 675, 690.)

(2) In many instances the owner-operator to obtain work will solicit the traffic directly from shippers and then make an arrangement with an authorized carrier in the form of a lease to use that carrier's rights to move the traffic. This is illegal, of course, but difficult to police because of the color of right given by the trip lease. (Report of Commission, 52 M.C.C. 675, 690.)

(3) The owner-operator being an independent contractor is not under the full control of the carrier, and the carrier's responsibilities to the shippers are therefore transferred to those outside of regulation. (Report of the Commission, 52 M.C.C. 675, 690.)

(4) The owner-operator being an independent businessman must keep his equipment rolling to make a living. This economic necessity has resulted in exces-

labor of supererogation, involving largely a recapitulation of the Commission's discussion of the need for and the appropriate means of regulation. 52 M.C.C. 675 et seq.

■ We cannot say that the evidence in the record affords no rational basis for the conclusions approved by the Commis-

sion, or that the rules promulgated by it are neither appropriate nor plainly adapted to carry out the Congressional intent expressed in the National Transportation Policy. There is no merit in the argument that such rules are unreasonable because they prescribe absolute uniformity with re-

sive violations of the Commission's safety regulations, particularly the Hours of Service Rules. (Report of Commission 52 M.C.C. 675, 691, 694.)

(5) The carriers using owner-operators on a trip lease basis having only a short relationship with the owner-operators are lax in inspecting the owner-operators' vehicles and the records of the owner-operators. (Report of Division 5, 51 M.C.C. 461, 472.)

(6) The carriers using owner-operator vehicles on a trip lease basis generally pay for such vehicles by dividing the revenues received from the shipper on a percentage basis with the owner-operators. This is not only illegal since it amounts to a division of rates between a carrier and a non-carrier (Report of Division 5, 51 M.C.C. 461, 472) but gives a carrier availing itself of this method of payment a tremendous economic advantage. The owner-operator who takes a percentage of the revenue only wants the traffic that pays high revenues, that is the better type of truckload merchandise traffic. Carriers depending on owner-operators therefore must concentrate on the better traffic, leaving the less desirable traffic to those carriers who own their own fleets and who must handle all types of traffic to secure the necessary volume to keep their equipment in use. Since the carriers using owner-operators concentrate on truckload traffic, their rates are lower than the carriers having large owned fleets who need relatively high truckload rates to provide adequate revenues to take care of the poorer paying less-truckload traffic. (Report of Commission, 52 M.C.C. 675, 693.) It is clear that the use of owner-operators distorts the carriers' operating statistics because many of the motor carrier expenses are borne by the owner-operators. Use of the operating statistics of carriers having extensive operations in leased equipment in rate cases is impossible. (Report of Commission, 52 M.C.C. 675, 693.)

(7) The use of owner-operators on a trip lease basis has resulted in the certificated carriers transferring their carrier responsibilities to those outside of regulation and relegated the carriers to

mere brokers of transportation. (Report of Division 5, 51 M.C.C. 461, 466.) Of course, the Commission has not certificated the carriers as brokers, so that these activities have aspects of illegality. What is worse is that the certificated carriers through the device of the trip lease "certificate" non-carriers to perform operations which by law require a certificate issued by the Commission.

(8) The abolition of the trip lease is supported by the Bureau of Motor Carriers (Report of Division 5, 51 M.C.C. 461, 468) by a considerable cross-section of the certificated common carriers, by several common carrier and contract carrier associations, by a number of state regulatory bodies, by the labor unions and by the railroads. (Report of Division 5, 51 M.C.C. 461, 468–484, inc.) Those opposing the abolition of trip leasing are largely carriers that have contributed to the break-down of regulation by the extensive use of this law evading device.

Having found that these many evils flourish because of the leasing arrangements, particularly the trip lease, the Commission determined that the solution was to abolish the trip lease so that the carriers in renting equipment would not, in effect, be leasing their certificates to non-carriers. At page 724 (52 M.C.C. 675) the Commission said: "We deem it necessary to exercise sufficient control over the leasing practices of these carriers (referring to certain household goods carriers) to be able to determine that a purported lease of equipment is just that, rather than an arrangement for a lease of operating rights or an extension of the same without our approval."

And at page 725: "We are convinced, however, that trip leasing, and especially trip leasing of equipment that is operated for the lessee by the owner, or employees of the owner, is inimical to sound regulation and proper administration of the provisions of Part II of the act and of our safety regulations. The rules prescribed herein will provide that leases of such equipment apply for a definite period. Such minimum period is necessary to insure proper inspection of

spect to carriers to which they apply or that they are arbitrary because certain carriers are exempted from the force of their operation. It is quite clear from the record that the classifications of carriers in the exempt category are reasonable.

It follows that plaintiffs and intervenors on their side of the controversy are not entitled to the relief for which they pray and that this action is due to be dismissed with prejudice. An order of dismissal will be presented and entered.

equipment and a check of the qualifications of the driver, particularly when the latter is not an employee of the lessee, and we find that a minimum period of 30 days would be reasonable."

In concluding that splitting of the revenues with the owners of leased equipment should be prohibited the Commission said again at page 725: "In this connection we observe the carriers which conduct operations entirely in non-owned equipment, and, more particularly, in equipment rented on the basis of a percentage of the revenue earned with the equipment, are in an extremely favorable competitive position as compared with carriers having substantial investments in equipment devoted to for-hire transportation. Moreover, a carrier's inability to provide service except in equipment owned and operated by others raises serious doubts as to its fitness and ability. This is a matter which undoubtedly merits more consideration than it has heretofore received in passing upon applications for operating authority and for extensions of such authority.

And at page 725: "We further conclude that compensation for the rental of equipment based upon a percentage of the revenue earned with equipment should be prohibited. This method of compensation leads the carriers which utilize owner-operated equipment to concentrate upon certain profitable traffic to the exclusion of other traffic. It certainly distorts the operating statistics of carriers which depend to a large extent upon equipment leased on that basis. We are persuaded also that it plays a large part in the practice of carriers which have extensive operating rights, but are unable or unwilling to provide service thereunder, of leas-

ing such rights to others under the guise of equipment leases."

Typical examples of problems arising out of interchange practices, of which there is substantial evidence in the record, are:

(a) Carrier had rights between Chicago and Louisville, Kentucky but solicited traffic beyond Louisville. The Chicago carrier performed all the transportation to points beyond Louisville and retained all the revenue, merely using the shipping documents of the local Kentucky carrier to cover the movements beyond Louisville. (52 M.C.C. 675, 685.)

(b) Carrier having no right to serve beyond St. Louis served territory outside of St. Louis in its own operation by merely using a lease secured from a local carrier covering the movement beyond St. Louis for which a flat fee of from three to five dollars was paid. This was merely typical of other instances of the same thing in Georgia and other points. (52 M.C.C. 675, 685, 686 and 687.)

To prevent the carriers from leasing the rights of other carriers under the guise of interchange arrangements, the Commission concluded that the interchange arrangements should necessitate service by two or more carriers rather than service by one carrier over two certificates. The only way to make certain that two carrier service is rendered is to have the employes of Carrier B operate the equipment received from Carrier A when it is moving over Carrier B's route. At page 722 (52 M.C.C. 675) the Commission said: "* * * A requirement that interchanged equipment must be driven by the employee of the carrier receiving it would prevent these practices."