STATE OF SOUTH CAROLINA ex relatione SOUTH CAROLINA PUBLIC SERVICE COMMISSION, Complainant,

v.

The UNITED STATES of America, The Interstate Commerce Commission, and the Atlantic Coast Line Railroad Company as the representative of all the railroad companies affected by the report of the Interstate Commerce Commission dated June 20, 1955 and by its order dated September 19, 1955, Docket No. 31291, Defendants.

Civ. A. No. 5261.

United States District Court
E. D. South Carolina.

Argued Nov. 4, 1955.

Decided Jan. 3, 1956.

T. C. Callison, Atty. Gen. of South Carolina, and Irvine F. Belser, Gen. Counsel, South Carolina Public Service Commission, Columbia, S. C., for complainant.

R. B. Gwathmey, Wilmington, N. C., Douglas McKay, Washington, D. C., U. B. Ellis, Wilmington, N. C., Charles P. Reynolds, James A. Bistline, Washington, D. C., James B. McDonough, Jr., Norfolk, Va., John H. Lumpkin, Frank

G. Tompkins, Jr., Columbia, S. C., for defendant Railroad Companies.

Stanley N. Barnes, Asst. Atty. Gen., N. Welch Morrisette, Jr., U. S. Atty., Columbia, S. C., James E. Kilday, Maurice A. Fitzgerald, Samuel R. Howell, Leo H. Pou, Robert W. Ginnane, Washington, D. C., for defendants the United States and Interstate Commerce Commission.

Before PARKER, Circuit Judge, and TIMMERMAN and WILLIAMS, District Judges.

### PARKER, Circuit Judge.

This is an action to set aside and enjoin the enforcement of an order of the Interstate Commerce Commission entered under section 13(4) of the Interstate Commerce Act, 49 U.S.C.A. § 13(4),[1] granting an increase in the intrastate freight rates for hauling certain commodities on railroads in the State of South Carolina. A court of three judges has been constituted as required by statute, the case has been heard upon the record made before the Commission and the briefs and arguments of counsel and has been submitted for final decree. The contention of plaintiff is that the order of the Commission is not supported by substantial evidence on the whole record that the railroads will realize any substantial increase of revenue from the increase of rates allowed by the order.

The facts are that the State of South Carolina is crossed by the great railroads constituting the principal arteries of commerce in the southeastern section of the United States and most of the hauling by railroad within the state is done by these systems. There is not now and for many years has not been any distinction in the handling of freight in interstate and intrastate commerce, the bulk of both interstate and intrastate freight being handled in the same way and with the same instrumentalities. If there has been any difference, it is that the cost with respect to intrastate freight is greater. The Commission found specifically, and there is no question as to the correctness of the finding, that "the conditions incident to the intrastate transportation of freight in South Carolina are not more favorable than those incident to interstate transportation of freight between points in South Carolina, on the one hand, and the adjoining states in Southern Territory, on the other."

It has long been the policy of the railroads to maintain intrastate rates in South Carolina and other southeastern states on the same level as interstate rates. During the period of advancing prices which have prevailed since the second world war, the railroads sought and obtained several general increases in interstate rates to meet their need for additional revenue caused by increased operating costs in providing the adequate and efficient railway transportation service required by the Federal Railway Transportation Act. These increased op-

1. 1. Section 13(3) of the Interstate Commerce Act, 49 U.S.C.A. § 13(3), authorizes the Commission to conduct an investigation where state rates are brought in question before it upon petition of a carrier. Section 13(4), 49 U.S.C.A. § 13(4), is as follows:

Sec. 13, par. (4) "*Duty of Commission where State regulations result in discrimination.* Whenever in any such investigation the commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding."

erating costs were incurred in the movement of intrastate as well as interstate traffic. To the extent that intrastate traffic fails to bear its fair share of the increased operating cost by providing additional revenue commensurate with that provided by interstate traffic, it places an undue burden on interstate commerce, and to relieve this burden a petition was filed with the Commission asking that the intrastate rates on certain commodities be raised to permit the same percentage increases allowed in interstate rates.[2] The Commission thereupon conducted an extended hearing and filed a lengthy report in which it reviewed the history of the rates affecting the commodities involved, as well as the evidence relating thereto and the contentions of the parties, and made the following findings, which are crucial to the decision in this case, viz.:

"3. The present intrastate rates and charges in South Carolina on clay, cotton, in bales, Cottenseed, cottonseed meal, cottonseed hulls, cottonseed oil, limestone, ground or pulverized, used for agricultural purposes, logs, sand, gravel, crushed stone and related commodities, road building materials, and pulpwood, imposed by authority of the State of South Carolina and under investigation in this proceeding, are generally lower than the interstate rates and charges on the same commodities between South Carolina and points in adjoining States, and traffic thereunder fails to produce its fair share of the revenue required by the respondents to enable them, under honest, economical, and efficient management, to provide adequate and efficient transportation service, and thereby accomplish the purpose of the Interstate Commerce Act as set forth in the national transportation policy declared by the Congress, to develop and preserve a national transportation system adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense; the burden thus cast upon interstate commerce is undue in and to the extent that these intrastate rates and charges are less than they would be on the basis herein approved; and these intrastate rates and charges cause, and for the future will cause, undue, unreasonable, and unjust discrimination against interstate commerce.

"4. The undue, unreasonable, and unjust discrimination against interstate commerce herein found to exist should be removed by applying to the South Carolina intrastate rates and charges, on the commodities described in finding 3, the same respective increases which are, and for the future may be, maintained by the respondents on like interstate traffic between points in South Carolina and points in adjoining States under our authorizations in Ex Parte Nos. 162, 166, 168 and 175; provided, that no intrastate rate shall be increased to a level that exceeds the lowest level of the interstate rates on like traffic over the same line of railroad to, from, or through South Carolina.

"5. The establishment of increases in intrastate rates and charges as provided in finding 4, and of the increased rates there prescribed, will not result in unjust or unreasonable rates or charges, nor rates or charges that are unjust or unreasonable in relation to the interstate rates and charges, and will substantially increase the respondents' revenues."

The findings of the Commission are not attacked except with respect to the finding that the increased rates will substantially increase the revenue of the railroads. As to this, plaintiff relies upon testimony, largely the prophecy of in-

---

2. The South Carolina Public Service Commission allowed the percentage increases on all intrastate traffic except on the commodities here involved.

terested shippers, that the increased rates will result in the diversion of traffic to carriers by truck. There is abundant testimony, however, supporting the findings of the Commission. Traffic experts of the three great railway systems serving the state testified unequivocally that, while there might be some diversion of traffic, the net result of the increase of rates would be to substantially increase revenues; and this testimony was not given ex cathedra but was supported by traffic studies introduced in evidence including a special four weeks' study which showed the increase in revenues due to increase in interstate rates on these commodities and included a four weeks' study showing the movement of these commodities in intrastate commerce and how much the revenues therefrom would have been increased by application of the percentage increases allowed in interstate rates. Thus the witness Kane, Assistant General Freight Agent of the Seaboard Air Line Railway Company, testified:

"Q. What comments have you to make on Section H of your exhibit? A. The Ex Parte 162 increases became effective interstate on January 1, 1947, and the other Ex Parte increases became effective interstate in 1948, 1949 and 1952. Most of the states granted these increases with relatively few exceptions on intrastate traffic during these same years. In Section H, I have shown the tonnage of each of the excepted commodities transported by each of the four principal South Carolina railroads during each of the years 1947 to 1952, inclusive, and also the revenue which each of these railroads received from these commodities during each of these years.

"I have also shown the total tonnage of the excepted commodities and the total revenue received from these commodities by the four principal South Carolina railroads during the years 1947 to 1952, inclusive. The tonnage and revenue received in 1947 is shown as 100 opposite the word 'Index', and the tonnage and revenue in the subsequent years have been related to the tonnage and revenue received in 1947.

"It will be noted that while there has been some variation in tonnage and revenue from year to year, the revenue received on each of the excepted commodities during the year 1952 was greater and in most instances materially greater that that received in 1947.

\* \* \* \* \* \*

"On road aggregates in 1952 tonnage exceeded the 1947 tonnage by 75 per cent and the 1952 revenue exceeded the 1947 revenue by 77 per cent.

"On pulpwood the 1952 tonnage of the Atlantic Coast Line Railroad and Charleston & Western Carolina Railroad exceeded the 1947 tonnage by 47 per cent and the 1952 revenue of these two carriers exceeded their 1947 revenue by 117 per cent.

"In my opinion this exhibit proves that the Ex Parte increases have resulted in very substantial increases in the carriers' revenues.

"Q. State whether or not, in your opinion, the increases sought in the instant case, if required by this Commission, will result in an increase in the carriers' revenues? A. The traffic officials of the Seaboard have given very careful consideration to the effect of the increase here sought on the carrier's revenues, and they are convinced these increases, if granted, will result in a substantial increase in revenues. This conclusion, I think, is amply supported by the showing made in Section H of my Exhibit 3. This section of the exhibit makes it plain that such diversions of traffic as may be occasioned by the increased rates do not come anywhere near offsetting the increases in revenue derived therefrom."

The witness Middleton, General Freight Agent of the Atlantic Coast Line Railroad Company, testified:

"Q. Do you think that, if granted, the increases in rates sought in this proceeding will produce increased revenue? A. I do. The most convincing proof is, I think, to look at what has happened to our total traffic since the several Ex Parte increases have been added. Page D–1 of my exhibit shows the total number of cars and tons handled by, and the freight revenues of Atlantic Coast Line for the years 1945 through 1952.

"World War II ended in 1945 and the first increase under Ex Parte 162 became effective in 1946. Using 1945 as a basis of 100, it will be observed that the percentage in cars and tons handled since shows a gradual but erratic increase. The revenues have, however, shown a much more consistent trend upward. While there was an increase in both the number of cars and tons handled in 1946, our revenues were slightly down. Had even the 6 per cent increase which became effective July 1, 1946, been in effect during the entire year there would have been an increase instead. Beginning in 1947 there has been a consistent trend upward in our revenues, except in 1949. This was a year of widespread strikes, particularly in the coal and steel industry. Even so our revenue was approximately 10 per cent over 1945, whereas we handled a lesser number of cars and less tons than in 1945. In 1952 our revenue was 57.6 per cent over 1945, while the number of cars handled had increased only 15.4 per cent and number of tons handled 38.-7 per cent.

"No comparable figures are available for South Carolina intrastate traffic, but, in my opinion, the total system figures are more pertinent anyway. The system figures include the movement under interstate rates, which have been subjected to the full authorized increases and have, therefore, borne the full impact of competition from other transportation agencies to which any traffic could have been diverted account of increased freight rates.

"It is a fact that some diversion has taken place as the result of some of the ex parte increases. Where such diversion has warranted, adjustments in the rates have been made. Such general adjustments have also been given intrastate application, however, so that these situations have also been met on intrastate traffic. The sought rates are not higher than on interstate traffic. We do not feel that the sought increases will be self-defeating but are convinced that they will produce more and not less revenue."

The witness Dilli, Assistant Freight Traffic Manager of the Southern Railway Company, testified:

"No doubt the question will arise as to the effect upon rail carriers' revenues if this Commission should find that the rates under consideration in this proceeding be increased to the level sought. Exhibit No. 11 shows particular data and, in addition, in the last column of figures on the right side there is shown the increased revenue of Southern Railway Company following the several Ex Parte proceedings indicated by reference marks on the extreme left hand side of the exhibit. As will be noted, except for the year 1949, Southern Railway Company's revenue both as to interstate traffic and intrastate and interstate traffic combined has increased each successive year since 1947. As indicated by reference mark (a), the year 1949, during which we had a decrease in freight revenue, was affected by the 'black days' in the coal industry along with other strike conditions in other industries. The year 1949 was a bad business year for all types of industry.

"If the increases sought in this proceeding are authorized by the Interstate Commerce Commission our revenue will be increased.

"Now a word in respect to diversions to other forms of transportation should the increase be authorized. Speaking for the Southern Railway, and I am sure other railroads in Southern Territory carry out the same policy as we do, we are constantly alert to all existing and potential competition confronting us, and it is our continuing purpose to take every available step to hold traffic to our line so as to produce increased revenue, and we are capable of exercising our managerial discretion necessary to achieve that objective."

It is clear that the foregoing testimony, together with the exhibits evidencing traffic studies upon which the testimony is based, furnish ample support for the finding of the Commission which is assailed. In United States v. Louisiana, 290 U.S. 70, 80, 54 S.Ct. 28, 33, 78 L.Ed. 181, which involved an order raising intrastate rates and the question as to whether the increased rates would produce increased revenue, the Supreme Court sustained an order of the Commission based on such testimony in the absence of a formal finding. The court recognized the judgment of the railroad traffic experts as an important factor for consideration by the Commission, saying:

"The objection that the finding of unjust discrimination by the intrastate rates against interstate commerce is unsupported by any finding that the increased rates would produce increased revenue is rested upon the statement, separated from its context in the Commission's report, 'we conclude that no positive finding in regard to the revenue outcome of the increases can be justified.' It is manifest that any finding of undue prejudice to interstate commerce, based upon the failure of prevailing intrastate rates to contribute their fair share to the support of a national transportation system, must necessarily rest upon a prediction that an increase of the intrastate rates will result in an increase of revenue, a prediction involving, especially since 1930, many elements of uncertainty. There are no formal requirements for the findings to be made by the Commission in this type of case, see Manufacturers Ry. Co. v. United States, 246 U.S. 457, 490, 38 S.Ct. 383, 62 L.Ed. 831, and while the particular form in which they were cast here is not to be commended, the report, read as a whole, sufficiently expresses the conclusion of the Commission, based upon supporting data, *including estimates of experienced railroad traffic men*, to which the report refers, that the probability of increased revenue was sufficiently great to make the increase of rates a reasonable exercise of sound managerial judgment. This, we think, meets the requirements of the statute." (Italics supplied.)

■ Whether experience with interstate rates is a dependable guide in judging the effect of a corresponding increase in intrastate rates is a matter of expert judgment as to which the opinion of the railroad traffic experts is certainly substantial evidence of real value, as their railroads will bear the loss if the increase of rates which they propose results in a decrease of revenue. Certainly their opinion is entitled to as much weight as prophecies of traffic loss by interested shippers who have everything to gain and nothing to lose by holding intrastate rates at the existing level. At all events, we cannot say that the evidence upon which the Commission acted, which consisted not only of the testimony of these experts but also of the traffic studies upon which it was based, was not substantial evidence. The matter involved is largely a matter of expert judgment; and the Commission is "a tribunal appointed by law and informed by experience" to deal with just such matters.

When it has based its order on evidence which is unquestionably substantial, we have no power to substitute our judgment or the judgment of the state commission for its judgment on the facts. This is too well settled to admit of argument. The rule was thus laid down more than forty years ago in Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541; 547, 32 S.Ct. 108, 111, 56 L.Ed. 308:

"In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the Commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the Commission are made by law prima facie true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' Illinois Central R. Co. v. I. C. C., 206 U.S. 441, 27 S.Ct. 700, 51 L.Ed. 1128. Its conclusion, of course, is subject to review, but, when supported by evidence, is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof, but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order."

Directly in point is the case of State of Florida v. United States, 292 U.S. 1, 12, 54 S.Ct. 603, 608, 78 L.Ed. 1077, wherein the Supreme Court was dealing with the power of the Commission to raise intrastate rates to remove the same sort of discrimination against interstate commerce as is involved in the case before us. Chief Justice Hughes laid down the rule here applicable in the following language:

"The question of the weight of the evidence was for the Commission and not for the court. The authority conferred upon the Commission by Section 13(4) of the In-terstate Commerce Act, with respect to intrastate rates, is not different in its quality or effect from that given to the Commission to prevent other sorts of unjust discrimination against interstate commerce. That authority rests upon the constitutional power of the Congress, extending to interstate carriers as instruments of interstate commerce, to require that these agencies shall not be used in such manner as to cripple, retard, or destroy that commerce, and to provide for the execution of that power through a subordinate body. Shreveport Case [Houston, East & West Texas R. Co. v. U. S.], 234 U.S. 342, 351, 354, 355, 34 S.Ct. 833, 58 L.Ed. 1341; Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co., supra [257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371]. The purpose for which the Commission was created was to bring into existence a body which, from its special character, would be best fitted to determine, among other things, whether upon the facts in a given case there is an unjust discrimination against interstate commerce. United States v. Louisville & Nashville R. Co., 235 U.S. 314, 320, 35 S.Ct. 113, 59 L.Ed. 245. That purpose unquestionably extended to the prohibited discrimination produced by intrastate rates. In relation to such a discrimination, as in other matters, when the Commission exercises its authority upon due hearing, as prescribed, and without error in the application of rules of law, its findings of fact supported by substantial evidence are not subject to review. It is not the province of the courts to substitute their judgment for that of the Commission."

See also Mississippi Valley Barge Co. v. United States, 292 U.S. 282, 286, 54 S.Ct. 692, 78 L.Ed. 1260; Swayne & Hoyt Ltd. v. United States, 300 U.S. 297, 304, 57 S.Ct. 478, 81 L.Ed. 659. The rule as above stated with respect to sustaining the order if supported by sub-

stantial evidence is the rule of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S. Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Southland Mfg. Co., 4 Cir., 201 F.2d 244.

The case of Mississippi Public Service Comm. v. United States, D.C., 124 F. Supp. 809, upon which plaintiff chiefly relies, was considered and quoted from by the Commission but was distinguished on the ground that in the present case there was substantial evidence to support the finding as to the increased rates producing increased revenue.

Another case upon which plaintiff places great reliance is State of North Carolina v. United States, 325 U.S. 507, 65 S. Ct. 1260, 89 L.Ed. 1760; but that case was distinguished from a case such as this by the Supreme Court in King v. United States, 344 U.S. 254, 73 S.Ct. 259, 97 L.Ed. 301 on the ground that the order there was based upon the mere disparity between intrastate and interstate rates and did not contain the essential findings which were made in the King case and have been made here.

Of course the estimates of the experts may prove to be erroneous and the increased rates may not produce increased revenue. If so, application will doubtless be made for another change in the rates and an appropriate order will be entered by the Commission;[3] but such a possibility would not warrant our setting aside an order which is unquestionably supported by substantial evidence on the whole record now before us.

For the reasons stated, the petition to set aside and enjoin the enforcement of the order of the Commission will be denied and the action will be dismissed.

Petition denied and action dismissed.

TIMMERMAN, District Judge.

I do not agree with the views of my able and distinguished colleagues in this case, as such views are expressed in the opinion of Chief Judge PARKER.

There is for consideration and determination this simple question: Is the conclusion of the Interstate Commerce Commission, that revenues of the railroads will be substantially increased by allowing increased intrastate freight rates on certain commodities to be shipped wholly within the State of South Carolina, supported by substantial evidence? I think not.

Evidence, if it is to be regarded as substantial, must have substance. It cannot be classed as substantial if it is vague or uncertain, or is the product of guess or surmise, or is equivocal. The evidence upon which the Interstate Commerce Commission acted is not only equivocal in many respects, it is vague and uncertain. I find in the record no established facts from which there can be drawn legitimate inferences as to what proportion of the commodities affected by the increased rates will be diverted by reason thereof from the railroads to other type carriers having lower rates. I do know as a matter of mathematical certainty that if the railroads lose twenty-five percent of the affected commodities the rate on the remaining three-fourths will have to be promoted by one-third to leave the railroads' revenue the same as it was before. I also know that if the commodities handled are reduced by only one-fifth that the rate on the remaining four-fifths will have to be increased by one-fourth to equal the revenue obtained before the rate was changed; and so on.

If we go in the other direction and reduce the commodities by one-third the rate will have to be increased by one-half for the railroads' revenue to continue constant.

The substance of the testimony offered by the proponents of the proposed rate increases is that they guess or surmise that the increased rates will result in increased revenue. They have not established any facts from which it can be concluded that the railroads will suffer

---

3. The railroads have already asked and been allowed to withdraw requests for percentage increases as to a few commodities as to which it had been demonstrated that raise in rates would result in loss of revenue.

only a certain percentage of diversion by reason of the increased rates.

On the other hand, the shippers testified that in their opinion the increased rates would result in decreased revenue to the railroads. That testimony, like the other, is largely guess and surmise. I find nothing in the record which warrants giving the railroads' witnesses preferential consideration. Both groups of witnesses should be placed in the same bracket. They both advocate acceptance of their guesses, as it is natural that they would do. Each group is undoubtedly biased in favor of its own opinions. If there was nothing more in this case than merely finding out what the railroads wanted it would have been unnecessary to have a hearing. That could have been determined by writing a letter. To say that if the railroads' officials have guessed wrong their guess can be corrected is to beg the question, for it is also true that if the shippers' guess is wrong it too can be corrected. We do have one fact in common in this case. It is this: Both groups agree that the increased rates will cause diversion of traffic from the railroads to other type carriers having lower rates. The only difference between them is their generalizations as to how much diversion will be accomplished by the increased rates. Of course the railroads hope that the increased rates will bring them increased revenue. This hope undoubtedly prompted the opinion that they will. I see nothing else in the record to justify the opinion. The shippers frankly are in favor of cheaper freight rates, which is natural, and they indicate that they intend patronizing the carriers that afford them the cheaper rates. If so, what then becomes of the hope of the railroads for increased revenue? To repeat, I have found in the record no established fact or facts justifying the conclusion that the revenue of the railroads will be increased, or that the diversion of freight from the railroads to other type carriers will be inconsequential by reason of the increased freight rates. I, therefore, dissent.