**STATE OF ALABAMA et al.,**
**Plaintiffs,**
**v.**
**UNITED STATES of America and Interstate Commerce Commission,**
**Defendants.**
**Civ. A. No. 8219.**

United States District Court
N. D. Alabama, S. D.
May 14, 1956.

---

John Patterson, Atty. Gen., and William H. Sanders, Asst. Atty. Gen.; State of Alabama, and, Morris K. Sirote, Sirote, Permutt, Friend & Friedman, Birmingham, Ala., for plaintiffs.

James E. Kilday and Frederica S. Brenneman, Attys., Dept. of Justice, Washington, D. C., and Atley A. Kitchings, then U. S. Atty., Birmingham, Ala., for United States.

Leo H. Pou, Associate Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission.

Cabaniss & Johnston, Sadler & Sadler, and Gibson & Gibson, Birmingham, Ala., Clarence Raymond, Louisville, Ky., James A. Bistline, Washington, D. C., E. D. Grinnell, Jr., St. Louis, Mo., Walter C. Scott, Jr., Savannah, Ga., Erle J. Zoll, Jr., Chicago, Ill. and John W. Adams, Jr., Mobile, Ala., for intervening railroad defendants.

Before RIVES, Circuit Judge, LYNNE, Chief Judge, and GROOMS, District Judge.

LYNNE, Chief Judge.

This is an action against the United States and the Interstate Commerce Commission (hereinafter referred to as the Commission), brought in this court, under 28 U.S.C. § 1336 and 2321 through 2325, by the State of Alabama, Alabama Public Service Commission (hereinafter referred to as the Alabama Commission), Alabama Coal Agency, a non-profit, voluntary, unincorporated association, whose members are engaged in the business of mining commercial coal within the State of Alabama and selling same, and five named corporations which are engaged in the scrap iron business in the State of Alabama. They ask the Court to enjoin, set aside and annul the reports and order of the Commission, dated April 4, 1955, 294 I.C.C. 579 and October 17, 1955, —— I.C.C. ——, in its Docket No. 31321, Alabama Intrastate Rates and Charges on Coal, Lumber and Scrap Iron.

The effect of the order under attack is to require all railroads operating in Alabama to increase Alabama *intrastate* rates and charges on bituminous coal to the levels prevailing on June 15, 1953 (prior to a general downward revision ordered by the Alabama Commission in its Docket No. 12865) and to apply to those increased rates the same respective increases as are, and for the future' may be, maintained by the railroads on like *interstate* traffic between points in Alabama and adjoining states, under the Commission's authorizations in Ex Parte No. 175, Increased Freight Rates, 1951, 280 I.C.C. 179, 281 I.C.C. 557, 284 I.C.C. 589, and 289 I.C.C. 395, and, further, to require such railroads to increase the present *intrastate* rates on scrap iron, where lower than the *interstate* scale rates applying, between points in Alabama and between points in Alabama and adjoining states, so that they will respectively be on the same level as the corresponding alternating *interstate* scale rates subject to the same minimum weights of 30,000, 50,000, and 80,000 pounds. (294 I.C.C. 579, 591)

Intervening as defendants as a matter of right pursuant to the provisions of 28 U.S.C. § 2323 and Rule 24(a), Fed. Rules Civ.Proc. 28 U.S.C. all affected railroads became parties in this proceeding.

Commencing in 1940, in obedience to the spirit of Sections 13(2) and 15a(2)[1] of the Interstate Commerce Act and in conformity with the National Transportation Policy stated in Section 1 of the Transportation Act of 1940,[2] the Commission undertook a continuing nationwide investigation of interstate railroad freight rates. In Ex Parte No. 162, Increased Railway Rates, Fares and Charges, 1946, 264 I.C.C. 695, 266 I.C.C. 537; Ex Parte 166, Increased Freight Rates, 1947, 269 I.C.C. 33, 270 I.C.C. 93, 270 I.C.C. 403; Ex Parte 168, Increased Freight Rates, 1948, 272 I.C.C. 695, 276 I.C.C. 9; and Ex Parte 175, Increased Freight Rates, 1951, 280 I.C.C. 179, 281 I.C.C. 557, 284 I.C.C. 589, 289 I.C.C. 395, the Commission, taking cognizance of steadily advancing operating costs, authorized the railroads to increase their *interstate* freight rates and charges for the purpose of providing the carriers with additional revenue to meet mounting costs for equipment materials, supplies and wages. Implicit in these pro-

1. Sec. 13(2), 36 Stat. 550; as amended, 41 Stat. 484, 49 U.S.C.A. § 13(2); Sec. 15a(2); 54 Stat. 912, 49 U.S.C.A. § 15a (2).

2. Sec. 1 of the Transportation Act of 1940, inserting a preamble to the Interstate Commerce Act, 54 Stat. 899, 49 U.S.C.A. note preceding section 1.

ceedings was the finding that increased operating costs were not confined to interstate traffic but were also related to the movement of intrastate traffic, and the contemplation, in determining the amounts of authorized increases, that like increases would be applied to intrastate traffic.[3]

On June 23, 1953, the present railroad defendants filed with the Commission a petition alleging that the revised scale of intrastate rates on commercial coal authorized by the Alabama Commission in its Docket No. 12865, by order dated February 27, 1953, and effective June 16, 1953,[4] so reduced existing rates that most of the revenue increases derived from prior Ex Parte Proceedings [5] had been eliminated.[6] The petition further alleged that by that action, and by its order in its Docket No. 13124,[7] authorizing a flat 10 per cent increase on this reduced scale (in lieu of the 12 per cent increase with a 40-cent-per-ton maximum authorized for interstate coal in Ex Parte 175), the Alabama Commission required the railroads to maintain unreasonably low rates which did not produce a fair share of necessary revenues, and which resulted in undue, unreasonable and unjust discrimination against interstate commerce in violation of Section 13(3) and (4) of the Interstate Commerce Act.[8]

3. In addition to the statements of the Commission in this regard in the instant proceeding at sheets 17–18 of its original report, April 4, 1955, and at sheet 11 of its report on reconsideration, October 17, 1955, see also: Louisiana Intrastate Freight Rates and Charges, 291 I.C.C. 279, 314, and Increased Freight Rates, 1951, 284 I.C.C. 589, 660.

4. The order established "base rates" based on the average mileage to common destinations in Alabama from "base group" mines in Alabama, with fixed differentials to be added or subtracted when the coal originated from other or "differential groups" of mines. (Exhibit 99)

5. General increases authorized in interstate rates by Ex Parte 162. Increased Railway Rates, Fares and Charges, 1946, 264 I.C.C. 695 and 266 I.C.C. 537, were secured for Alabama Intrastate Coal only after a Section 13 proceeding determined that denial by the Alabama Commission of these increases was discriminatory. Alabama Freight Rates and Charges, 274 I.C.C. 439. Similarly, the increases prescribed on interstate coal in Ex Parte 166, Increased Freight Rates, 1947,. 269 I.C.C. 33, and 270 I.C.C. 81, 93 and 403 (three reports), and in Ex Parte 168, Increased Freight Rates, 1948, 272 I.C.C. 695 and 276 I.C.C. 9, required action by the Commission before they were authorized in Alabama, Alabama Intrastate Rates and Charges, 1950, 278 I.C.C. 605.

6.

|  | | From<br>Alabama Base Groups | | | | | |  |
| To | Pre-<br>scribed<br>in<br>1923 by<br>A.P.S.C. | Including- —<br>X–<br>115 | X–<br>162 | X–<br>166 | X–<br>168 | A.P.S.C.<br>Dkt.<br>12865<br>Rate | Total<br>In-<br>creases<br>X–<br>162–168 | Reduc-<br>tion Re-<br>quired<br>by<br>A.P.S.C. |
|  |  | (In cents per net ton) | | | | | |  |
| Birmingham, Ala. | 79 | 84 | 99 | 119 | 131 | 90 | 47 | 41 |
| Phoenixville, Ala. | 79 | 84 | 99 | 119 | 131 | 105 | 47 | 26 |
| Mineral Springs, Ala. | 79 | 84 | 99 | 119 | 131 | 90 | 47 | 41 |
| Sylacauga, Ala. | 125 | 130 | 155 | 186 | 205 | 160 | 75 | 45 |
| Athens, Ala. | 150 | 160 | 185 | 222 | 244 | 185 | 84 | 59 |
| Montgomery, Ala. | 145 | 155 | 180 | 216 | 238 | 185 | 83 | 53 |

7. Exhibit 98.

8. Sec. 13(3) "Whenever in any investigation under the provisions of this part, or in any investigation instituted upon petition of the carrier concerned, whch petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made or imposed by authority of any State, the Commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding. The Commission may confer with the authorities of any State having regula-

By amendment to their petition, dated November 12, 1953, the railroads asked the Commission also to investigate alleged unreasonably low intrastate rates on scrap iron which the Alabama Commission had on four occasions refused to increase to the higher interstate levels.[9] A history of the general rate adjustment on scrap iron in Southern territory established in June, 1932, is contained in Exhibit 83 of the record before the Commission.

The hearing before the Commission was conducted by an examiner and resulted in a record consisting of 532 pages of testimony and 132 exhibits. The Examiner issued a proposed report; the present plaintiffs excepted thereto; the present defendant rail carriers replied to the exceptions; the issues were argued before the Commission; the Commission issued its report of April 4, 1955; the plaintiffs filed petitions for reconsideration and reargument; the rail carriers replied to such petitions; the Commission reopened the proceeding for reconsideration, and after carefully reexamining the evidence, affirmed its prior decision in its report of October 17, 1955, and simultaneously issued its order of which plaintiffs are here complaining.

A Court of three judges has been constituted as required by statute;[10] the case has been heard upon the record made before the Commission and the briefs and arguments of counsel, and, by agreement of the parties, has been submitted for final decree.

Prolific diligence of counsel for the competing parties has produced original and supplemental briefs in behalf of plaintiffs, aggregating 215 pages, and in behalf of defendants, aggregating 174 pages. No pertinent decision of Commission or Courts has escaped their attention either by citation or by discussion. Adroitly they have dissected the testimony of witnesses and the exhibits considered by the Commission for the avowed purpose of demonstrating the substantiality of the evidence, on the one hand, or of illustrating on the other, that, due to its dissembling nature, it does not rise above the level of mere rags and tatters. Cf. United States ex rel. Lindenau v. Watkins, D.C., 73 F. Supp. 216.

tory jurisdiction over the class of persons and corporations subject to this part or part III with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the Commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings with any such State regulating bodies on any matters wherein the Commission is empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the Commission. The Commission is also authorized to avail itself of the cooperation, services, records, and facilities of such State authorities in the enforcement of any provision of this part or part III." 49 U.S.C.A. § 13(3).

Sec. 13(4) "Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding." 49 U.S.C.A. § 13(4).

9. Alabama Commission Docket 4136 (1932) (rehearing 1938); Docket 8271 (1941); and Docket 13389 (1953), which appears as Exhibit 100.

10. 28 U.S.C. § 2284.

To respond to each ardent insistence of counsel would result in an unduly extended opinion. We are content to dispose of plaintiffs' assault upon the power of the Commission to increase intrastate rates in order to remove discrimination against interstate commerce and upon the constitutionality of Section 13(3) and (4), under which it purported to act, by citing: Simpson v. Shepard, (Minnesota Rate Cases), 1913, 230 U.S. 352, 33 S.Ct. 729, 57 L. Ed. 1511; Houston, East and West Texas Railway Company v. United States, (Shreveport Rate Case), 1914, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341; Railroad Commission of Wisconsin v. Chicago, Burlington & Quincy Railroad Company, 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371; State of New York v. United States, 257 U.S. 591, 42 S.Ct. 239, 66 L. Ed. 385; State of Louisiana v. United States, 290 U.S. 70, 54 S.Ct. 28, 78 L.Ed. 181; State of Texas v. United States, 337 U.S. 911, 69 S.Ct. 1162, 93 L.Ed. 1722.

Laboring painfully the proposition that the Commission misapplied, indeed misapprehended, the law, plaintiffs assert that it treated the proceeding before it as one involving "rates" and not "revenue"; that its ultimate conclusion, spawning its ill-begotten order, was rested merely upon an obvious disparity between interstate and intrastate rates upon the same commodities; that, in short, it construed Section 13(4) as a self-executing requirement of complete uniformity in such rates. Cf. State of North Carolina v. United States, 325 U. S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760. We do not agree. Clearly emerging from its discussion of its basic and subsidiary findings, appearing in both its original and reconsidered reports, is its awareness that its power to interfere with the rate-making function of a State may only be exercised when it may demonstrate that the State-prescribed rate injuriously affects interstate commerce.

The limited scope of our review of the order complained of requires neither redefinition nor elaboration. It has been spelled out in Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308; Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 54 S. Ct. 692, 78 L.Ed. 1260; Rochester Telephone Corp. v. United States, 307 U.S. 125, 139, 59 S.Ct. 754, 83 L.Ed. 1147; and Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456.

Leaving no stone unturned, plaintiffs vigorously assail each of the five findings of the Commission, reproduced in the margin.[11] Each of them has been

---

11. Finding 1. The conditions incident to the intrastate transportation of coal and scrap iron, in carloads, in Alabama are not more favorable than those incident to the interstate transportation of the same commodities in Alabama and in the adjoining States.

Finding 2. The present Alabama intrastate rates and charges on coal and scrap iron imposed by the authority of the State are abnormally low, and traffic moving thereunder fails to produce its fair share of the earnings required to yield revenue sufficient to enable the respondents under honest, economical, and efficient management to provide adequate and efficient railway transportation service at the lowest cost consistent with the furnishing of such service, and thereby accomplish the purpose of the Interstate Commerce Act, as set forth in the national transportation policy declared by the Congress, to develop and preserve a national transporation system adequate to meet the needs of the commerce of the United States, of the postal service, and of the national defense; the burden thus cast upon interstate commerce is undue in and to the extent that these intrastate rates and charges are less than they would be on the bases herein prescribed; and these intrastate rates and charges cause undue, unreasonable, and unjust discrimination against interstate commerce.

Finding 3. The undue, unreasonable, and unjust discrimination herein found to exist should be removed by increasing the present Alabama intrastate rates and charges on bituminous coal to the level or amounts of the intrastate rates prevailing on June 15, 1953, and by applying to such increased intrastate rates the same respective increases as are, and for the future may be, maintained by re-

examined separately and collectively, to determine whether, assuming that each was supported by substantial evidence, there were present the essential elements to support the Commission's action in supplanting State-prescribed intrastate rates.

Each of such findings has been subjected to judicial scrutiny on other occasions and has been approved both as to adequacy and clarity. It would be pure supererogation to add a gloss to the rationale of such pertinent opinions. In capsule form we asquiesce as follows:

Finding No. 1. King v. United States, 344 U.S. 254, 73 S.Ct. 259, 97 L.Ed. 301; State of North Carolina v. United States, D.C., 128 F.Supp. 718, 721, affirmed 350 U.S. 805, 76 S.Ct. 45.

Finding No. 2. King v. United States, supra; State of North Carolina v. United States, supra; Louisiana Public Service Commission v. United States, D.C., 125 F.Supp. 180, affirmed 348 U.S. 885, 75 S.Ct. 206, 99 L.Ed. 695; State of Tennessee v. United States, D.C., 113 F. Supp. 634, affirmed 346 U.S. 891, 74 S. Ct. 222, 98 L.Ed. 394.

Finding No. 3. King v. United States, supra; State of North Carolina v. United States, supra; Louisiana Public Service Commission v. United States, supra; State of Tennessee v. United States, supra.

Finding No. 4. King v. United States, supra; State of Tennessee v. United States, supra; State of North Carolina v. United States, supra; Louisiana Public Service Commission v. United States, supra.

Finding No. 5. King v. United States, supra; State of Tennessee v. United States, supra; State of North Carolina v. United States, supra; Louisiana Public Service Commission v. United States, supra.

In performing our reviewing function we are not permitted to assume that the findings, which we hold to be adequate, are supported by substantial evidence. We have not done so. For it was on this front that the main battle was pitched. In oral arguments and in briefs, unsurpassed in this court for precision in factual presentation and analysis, counsel for the competing parties have hotly contested the substantiality literally of each scrap of evidence thought either to support or to detract from the validity of each finding.

Mindful that there has been entrusted to our keeping the question as to whether on the record as a whole there is substantial evidence to support the Commission's findings, we have essayed a painstaking, time-consuming search of the entire record to determine whether the reports and order of the Commission are "justified by a fair estimate of the worth [of the evidence, including the testimony of witnesses] or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 490, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456.

Considering the record as a whole and taking into account contradictory evidence and evidence from which conflicting inferences may be

---

spondents on like interstate traffic between points in Alabama and adjoining States, under our authorization in Ex Parte No. 175; and by increasing the present Alabama intrastate rates and charges on scrap iron, where lower than the interstate scale rates applying between points in Alabama and between points in Alabama and adjoining States, so that they will respectively be on the same level as the corresponding alternating interstate scale rates subject to the same minimum weights of 30,000, 50,000, and 80,000 pounds.

Finding 4. The establishment of increased rates and charges as provided in finding 3 will not result in unreasonable rates or charges, or rates and charges that are unreasonable in relation to interstate rates and charges, and will result in a substantial increase in respondents' revenues.

Finding 5. The increased revenues to the respondents which will result from the increased rates and charges as provided in finding 3 are required from intrastate traffic in Alabama in order to enable the respondents to provide adequate and efficient railway transportation service.

drawn, we hold that there was substantial evidence to support the following findings of fact made by the Commission:

1. Finding No. 1, in its entirety.

2. The involved Alabama intrastate rates are abnormally low.

3. Traffic in the affected commodities moving under the rates prescribed by the Alabama Commission fails to produce its fair share of the revenues required by the railroads.

4. The burden cast upon interstate commerce by the abnormally low Alabama rates is undue and results in discrimination against such commerce.

5. The intrastate rates prescribed by the Commission will not result in unreasonable rates or charges.

6. Finding No. 5, in its entirety.

For the sake of brevity we pretermit a discussion of the evidence which we conclude meets the test of substantiality and upholds the foregoing findings. Nor do we deem it necessary to refer to its source in the transcript of the testimony or in the exhibits since counsel, in briefs, have devoted much time and space to its analysis and criticism.

In the atmosphere of the oral arguments there was created an impression that the gravest question before the Court related to the ultimate conclusion of the Commission, expressed in its

Finding No. 3. It concluded, in substance, that the Alabama intrastate rates, which it prescribed, would remove the undue, unreasonable, and unjust discrimination against interstate commerce existing as a result of the rates authorized by the Alabama Commission. Essentially, as the Commission recognized, the validity of this conclusion depends upon its subsidiary finding (Finding No. 4) that increased intrastate rates can reasonably be expected to result in an increase in the carriers' revenues. United States v. Louisiana, 290 U.S. 70, 80, 54 S.Ct. 28, 78 L.Ed. 181; State of Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291.

That such a finding is necessarily more prophetic than empirical in nature is self-evident. On this point there is a striking parallel between the record evidence in this case and that found by the Court to have been abundant in State of South Carolina ex rel. South Carolina Public Service Commission v. United States, D.C.S.C.1956, 136 F.Supp. 897. There, as here, the Court was concerned with the conflicting predictions of traffic experts for the affected carriers and representatives of interested shippers as to what effect increased intrastate rates might be expected to have on the railroads' revenues. The former, with one accord, estimated that such higher rates would produce more revenue;[12] the lat-

12. J. C. Kuebert, Assistant to Freight Traffic Manager of the Louisville and Nashville Railroad Company, with over 40 years experience in the Freight Traffic Department of that company, testified as follows:

"Q. Mr. Kuebert, are the officials of your railroad and of the railroads generally aware of the competition with which we are faced in the movement of coal and scrap iron? A. I don't know of anything that is giving the railroads more concern than the coal adjustments. They are always studying to see what can be done. We carry a very elaborate system of tonnage figures, movements, and watch it very closely.

"Q. And are the other railroads as well as your railroad serving the interstate coal fields faced with similar competition? A. That is true, not only in Alabama but in Kentucky, Tennessee, Illinois and Ohio and every place where our coal is being marketed.

"Q. I believe you stated that the railroads are endeavoring to hold the traffic to the railroads and increase their revenue whenever it is possible for them to do it? A. Wherever it is possible to work out an adjustment, we do that; but we know we cannot do it by a mileage scale.

"Q. State whether or not in your opinion the matter as to meeting competition is one that should be left to the managerial discretion of the railroads. A. There is no question about that. The managers of the railroads are the ones who have to meet the payrolls and they are the ones who have to produce something for the stockholders, they are the ones responsible, and they are the ones really who

ter with obvious sincerity, were convinced that they, conjoined with competing economic factors, would result in the diversion of traffic in coal and scrap iron to carriers by truck. We are in agreement with that Court's approach to the

evaluation of irreconcilable opinion testimony and deem it unnecessary to elaborate upon Judge Parker's reasoning.

█ Once before this Court has declared that it is the task of the Commission and not of the courts to pass upon

should be able to better judge what is necessary. They want to cooperate and have cooperated time and time again with the producers in working out the best situation we possibly can to meet the competition where it can be met.

"Q. Is it your considered judgment and the considered judgment of the officials of your company that if the increases here sought are placed in effect that they will result in substantial increases in revenue to your Company? A. We have studied it very carefully and we conclude that it would result in a very, very substantial increase in our revenue by these increases we are here seeking."

\* \* \* \* \*

"Q. Now, referring to your Exhibit No. 34, you project an increase which you would have realized on a three months movement of coal from Alabama mines to destinations in Alabama to a year basis and it shows that you would have realized an increase in revenue of $48,168.76. Now, that of course is assuming that you would have handled the same amount of Alabama coal had these increases been effective during that period of time, is that right? A. That is correct, and had the increases been made there would have been practically the same movement as if the increases had not been made."

\* \* \* \* \*

"Q. Referring to your Exhibit No. 42, which is a statement covering the commercial shipments of bituminous coal terminated by certain lines in Alabama and Alabama intrastate traffic for the month of October 1953, and there again, sir, is it your opinion that that movement of coal in its entirety would have been handled had the rates which you here propose been in effect during the period shown? A. That is correct."

\* \* \* \* \*

"Exhibit 87 is the interstate movement of scrap iron terminating on the L & N during the months of January, April, July and October 1952 or the same months as shown on the previous exhibit. It shows the destination, origin, short line miles, number of cars, weight, present rate and present revenue. It will be noted there is a very considerable movement of scrap iron from interstate to Alabama destinations, all of which moved on the inter-

state scale. The amount of money there involved is $271,054. It shows that the interstate scale has not prevented the movement, the present movement of scrap iron from interstate origins into the State of Alabama."

\* \* \* \* \*

"Exhibit No. 91 is a statement showing the Alabama intrastate present and sought revenue on scrap iron as terminated by the L & N, Southern Railway, the Frisco and the Central of Georgia. These are the lines that will present some evidence, and I simply have taken their figures and consolidated them for the convenience of the record. It shows here that the result of what the carriers are seeking is to increase the revenue on intrastate traffic $172,735."

\* \* \* \*

"Q. Mr. Kuebert, is it your judgment and the considered judgment of the officials of your company that if the proposed rates that you are seeking are placed in effect on Alabama intrastate traffic will result in substantial increases in revenues to the carriers? A. Yes, sir."

\* \* \* \*

C. W. Dilli, Assistant Freight Traffic Manager of the Southern Railway System, with over 30 years experience in the Freight Traffic Department of his company, testified:

"Q. Have you any opinion as to the effect the rates sought in this proceeding will have on the revenue of the Southern Railway Company and the Alabama Great Southern Railway Company? A. Yes, sir. It is my opinion that if the rates and increases sought in this proceeding are permitted to become effective by the ICC it will increase our revenue."

\* \* \* \* \*

"Q. Mr. Dilli, if the rates sought on scrap iron in this proceeding become effective, what is your opinion as to the effect it would have on the revenue of Southern Railway? A. It is our considered judgment that the revenue of Southern Railway and lines that participate in this movement would be increased.

"Q. And do you include the Alabama Great Southern Railroad? A. Yes, sir, all of them."

R. M. Kappel, Assistant General Freight Agent of the Illinois Central Rail-

the weight and credibility of the evidence. American Trucking Assn's v. United States, D.C., 101 F.Supp. 710, affirmed 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337. We do not assume the role of triers of fact to test the validity of relevant opinions of witnesses in the light of their training, experience, interest and general competency and the facts and circumstances on which their respective opinions were based. That is precisely the function which the Commission, aided by its expertise, is designed to perform.

That is not to say that naked opinions, unsupported by any facts, would

road, with 18 years experience in the Traffic Department of the Illinois Central Railroad, testified as follows:

"Q. Mr. Kappel, is it your judgment and considered opinion as one of the officers of your company that the increase in rates here sought will produce additional revenue for the carriers? A. That's right.

"Q. And is your company and the railroads generally aware of the competition with which they are faced? A. That's right.

"Q. State whether or not your company is endeavoring to hold traffic to the railroads and increase the revenue? A. We are continually making studies of the competitive situation, and efforts are being made to adjust to such situation where necessary to hold or increase traffic.

"Q. I take it that you subscribe to the testimony of witness Kuebert to the effect that such competition cannot be met by the prescription of an arbitrary or mileage scale of rates, is that true? A. That is correct.

"Q. State whether or not in your opinion the matter of meeting competition is one which should be left to the managerial discretion of the carriers? A. I am very much in agreement with that."

C. J. Toshach, Commerce Agent, Central of Georgia Railway, with 30 years experience in the Traffic Department of that company, testified:

"My Exhibit No. 81, three pages, is a statement of the movement of coal from Alabama origins to Central of Georgia Railway destinations in Alabama during the period January 1 through June 15, 1953. Shipments to points to which no change in rates was made as result of the order in APSC Docket No. 12865 are not included. This statement shows the rates in effect June 15, 1953, with and without the 12 per cent increase authorized under Ex Parte 175 along with the revenue resulting therefrom, compared with the rates and revenue resulting therefrom as prescribed in APSC Docket No. 12865, plus 10 per cent which were made effective June 16, 1953. There were 536 cars in this movement on which $71,867.-68 accrued as freight charges. Had the same increase as authorized on interstate traffic under Ex Parte No. 175 been in effect on intrastate traffic at that time carriers would have earned $80,472.40 or $8,604.72 more than was collected. Under the basis of rates under attack in this proceeding the total freight revenues would have amounted to $60,479.02 or $11,388.66 less than accrued under the rates in effect on June 15, 1953, without the Ex Parte No. 175 and $19,993.38 less than would have accrued under the June 15, 1953, rates plus Ex Parte No. 175 increase."

\* \* \* \* \*

"Q. Now, Mr. Toshach, state whether or not it is your considered judgment and the best judgment of the officials of your company that the proposed rates or rates that the carriers are here seeking on scrap iron and coal will produce additional revenue to your company and for the railroads of Alabama. A. Yes, sir.

"Q. Is your company aware of the competition with reference to these particular commodities? A. They are keenly aware of this competitive situation, particularly as to coal and they are doing everything in their power to see that the coal situation on the rails and the reasonable rates for this traffic is held with the railroads.

"Q. And you and your company are also of the opinion that the increases in scrap iron rates, will produce additional revenue for the carriers, are you not? A. Definitely.

"Q. Otherwise you wouldn't be here, would you? A. That's right.

"Q. State whether or not in your opinion the matter of meeting competition is one that should be left to the railroad management. A. We think that the management should be given more latitude in these matters, definitely.

"Q. Do you subscribe to the testimony of Mr. Kuebert to the effect that in meeting competition of natural gas or truck or other kinds of fuels, that that cannot be done by a flat or arbitrary mileage scale, but each situation must be considered by the railroad management? A. Definitely. The situations vary and they must be met by different standards."

be considered substantial evidence. That is not the case before us. Traffic studies on coal and scrap iron conducted for a period of three months under the depressed Alabama rates on coal and for a period of four to five months under existing rates on scrap iron were referred to by railroad witnesses. Resort to records of movements of these same commodities during equivalent periods in other years enabled them to project the results of such studies on a full twelve months' basis. Assuming no diminution of traffic, they demonstrate that very considerable additional revenue would have been produced had the higher rates prescribed by the Commission then been in effect.

Of the opinion that the proposed rates would result in virtually no diversion of traffic in either commodity, the railroad witnesses at least had some precedent upon which to rely. At the request of the coal shippers and as an experiment, rates and charges on coal were lowered voluntarily by the rail carriers in 1939 through 1941. The result was a drastic decrease in revenues without any concomitant increase in coal traffic. Moreover, Exhibit 14 shows that the movement of coal and scrap iron in the southern region, largely transported by the Alabama carriers, during the period 1946 through 1952, under greatly increased rates, produced substantial increases in revenue.

The most impressive indication that there may be negligible loss of rail traffic in coal to trucks was derived from the railroads' Exhibit 18. Under increased rates the diversion of coal traffic to trucks was only 9.3% in 1952, as compared with 12.6% in 1949.

An attempt to articulate the statistical information assembled in the 132 exhibits would involve a process of arithmetical progression and would extend this opinion ad infinitum. We recognize that reliance upon the totality of past experience is inherent in the exercise of managerial discretion in forecasting future trends. While we cannot be sure that the increased rates will result in additional revenues we are satisfied, after reviewing the record as a whole, that there was substantial evidence to support the Commission's findings that they will.[13]

Our omission of references to evidence offered in behalf of plaintiffs is not intended as an indication that we have weighed it and found it wanting. The integrity, ability and sincerity of each of their witnesses touch our sensibilities. But "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 54 S. Ct. 692, 694, 78 L.Ed. 1260.

For the reasons stated, the prayer to set aside and enjoin the enforcement of the order of the Commission will be denied and the action will be dismissed.

13. Pertinent here is Judge Parker's observation in State of South Carolina ex rel. South Carolina Public Service Commission v. United States, D.C., 136 F. Supp. 897, 904: "Of course the estimates of the experts may prove to be erroneous and the increased rates may not produce increased revenue. If so, application will doubtless be made for another change in the rates and an appropriate order will be entered by the Commission; but such a possibility would not warrant our setting aside an order which is unquestionably supported by substantial evidence on the whole record now before us."